[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 29, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-10699

_____

D. C. Docket No. 95-01332-CIV-T-17A

DAVID HIPP, and all others similarly situated;
BRAD STEIN, and all others similarly situated;
et al.,

Plaintiffs-Appellees,

versus

LIBERTY NATIONAL LIFE INSURANCE CO.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 29, 2001)

Before BLACK, FAY, and COX, Circuit Judges.

PER CURIAM:

This age discrimination appeal requires us to decide several issues concerning application of the "single-filing," or "piggybacking," rule[1] to opt-in collective actions under 29 U.S.C. § 216(b). We address these important issues in Part I of this opinion, and we provide a brief summary of our holdings here. We first clarify the meaning of the "similarly situated" requirement under § 216(b). We conclude the similarly situated requirement is not particularly stringent, and we suggest an approach district courts can use to better manage these cases. We next consider the proper temporal scope of § 216(b) collective actions, an issue this Court has not yet directly addressed. As to the proper rearward cutoff date, we conclude in order to properly opt into a § 216(b) action, a plaintiff must allege discriminatory treatment within 180 or 300[2] days before the representative

_____

[1]The "piggybacking," or "single-filing," rule allows plaintiffs who did not file timely charges of discrimination with the Equal Employment Opportunity Commission (EEOC) to "piggyback" onto the timely charge of a named plaintiff. *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1101 (11th Cir. 1996). We will use the terms "piggybacking" and "single-filing" interchangeably.

[2]Whether a plaintiff must allege discriminatory treatment within 180 days or within 300 days depends on whether that plaintiff lives in a "deferral" or "non-deferral" state. Non-deferral states are those without laws banning age discrimination in employment and without state entities authorized to grant or seek relief for victims of age discrimination. *See Grayson*, 79 F.3d at 1100 n.20. Plaintiffs in non-deferral states must file charges of discrimination with the EEOC within 180 days after the allegedly discriminatory

2

plaintiff's charge is filed with the Equal Employment Opportunity Commission (EEOC). We conclude the proper forward cutoff date is the date of filing of the representative charge. Plaintiffs who do not allege discriminatory treatment occurring during this period may not opt into a § 216(b) action. In other words, a plaintiff must have been able to file his or her charge of discrimination on the date the representative plaintiff filed the representative charge.[3] In Part II of this opinion, we address the sufficiency of the evidence presented in this case.

BACKGROUND & PROCEDURAL HISTORY

This case arises under the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. §§ 621-34, and the Florida Civil Rights Act of 1992 (FCRA), Fla. Stat. Ann. §§ 760.01-760.11. Plaintiffs David Hipp, Harry W. McKown, Jr., and Brad Stein filed their original complaint in Florida state court, alleging Appellant Liberty National Life Insurance Company (Liberty National)

---

acts. *Id.* Deferral states are those with laws banning age discrimination in employment and state entities authorized to seek relief for age discrimination victims. *Id.* at 1100 n.21. In deferral states, putative plaintiffs have 300 days in which to file their EEOC charges, and they "must also have commenced proceedings under state law before filing" civil actions. *Id.* (internal quotation marks and citation omitted).

[3]We leave room for a possible exception in certain rare cases. *See infra* note 22 and accompanying text.

3

engaged in a pattern and practice of age discrimination resulting in Plaintiffs' constructive discharges. These three named Plaintiffs claimed to bring the case on behalf of themselves and others similarly situated.

Liberty National removed the case to the United States District Court for the Middle District of Florida. Plaintiffs amended the complaint to add another named Plaintiff, Mike Stell. Plaintiffs then informed the district court they intended to pursue a collective action under 29 U.S.C. § 216(b). Plaintiffs sought to distribute notice of an opt-in class under § 216(b). Liberty National opposed this motion, maintaining Plaintiffs were not "similarly situated." Liberty National further argued that even if Plaintiffs were similarly situated such that a collective action was proper, Plaintiffs' proposed notice was defective because it would allow opt-in by individuals who could not properly piggyback into the case. On February 6, 1996, the district court approved Plaintiffs' proposed notice. *Hipp v. Liberty Nat'l Life Ins. Co.*, 164 F.R.D. 574, 576 (M.D. Fla. Feb. 6, 1996). The district court adopted the following class definition, proposed by Plaintiffs:

> All persons who are, or were, employed by Liberty National Life Insurance Company on or after August 25, 1993, who are, or were, managerial employees, district managers or above, residing in the United States, who were over 40 years of age.
> *Id.*

Over twenty individuals eventually filed consents to opt in, although some were untimely.[4]

After the close of extended discovery, Liberty National sought to sever the cases. Liberty National also filed motions for summary judgment as to the claims of several Plaintiffs. The court substantially denied Liberty National's motions for summary judgment.[5] The court also denied Liberty National's request to certify an interlocutory appeal and its motion to sever the cases.

---

[4]This appeal concerns the claims of named Plaintiffs Hipp, Stein, and Stell, as well as the claims of four "opt-in" Plaintiffs: Tony Agee, Harold Carter, James Lee, and Blake Tuggle. These seven Plaintiffs prevailed at trial. Named Plaintiff McKown's claim resolved in mediation before trial. Named Plaintiffs Hipp and Stein and opt-in Plaintiffs Lee, Carter, and Tuggle allege they were constructively discharged in violation of ADEA. Opt-in Plaintiff Agee alleges his employment was terminated in violation of ADEA. It is unclear whether named Plaintiff Stell alleges constructive discharge or unlawful termination. He tendered his resignation, effective February 17, 1995, on February 6, 1995. He alleges he was fired February 14, 1995. The Amended Complaint alleges at ¶ 20 that his employment was terminated, but alleges at ¶ 24 that he resigned. The jury's verdict forms treat Stell's claim as one of constructive discharge and award damages on that basis. We will therefore also treat Stell's claim as one of constructive discharge.

[5]The court granted summary judgment to Liberty National on the claims of some opt-in Plaintiffs it determined did not fall within the definition of the class, but these Plaintiffs' claims are not at issue in this appeal. *Hipp v. Liberty Nat'l Life Ins. Co.*, 973 F. Supp. 1033, 1040-41 (M.D. Fla. 1997).

The claims of ten Plaintiffs were tried before a jury over the course of five weeks beginning June 1, 1998. The jury returned verdicts on July 9, 1998, finding that Liberty National had engaged in a pattern and practice of age discrimination, but returning defense verdicts as to three of the ten Plaintiffs, whose claims are not at issue in this appeal.

The jury's verdicts awarded back pay and ADEA liquidated damages to the seven prevailing Plaintiffs. *Hipp v. Liberty Nat'l Life Ins. Co.*, 65 F. Supp. 2d. 1314, 1334-35 (M.D. Fla. 1999); *Hipp v. Liberty Nat'l Life Ins. Co.*, 29 F. Supp. 2d. 1314, 1318-19 (M.D. Fla. 1998). Plaintiffs Hipp and Stein received punitive damages and pain and suffering damages under the FCRA, and the jury returned advisory front pay verdicts as to the five prevailing Plaintiffs other than Hipp and Stein. The district court ordered that no Plaintiff should receive front pay because the Plaintiffs' front pay award estimates were too speculative. *Hipp*, 65 F. Supp. 2d. at 1336; *Hipp v. Liberty Nat'l Life Ins. Co.*, 39 F. Supp. 2d. 1359, 1361-64 (M.D. Fla. 1999). Furthermore, the district court remitted some of the punitive damages and liquidated damages awarded to Stein and Hipp. *Hipp*, 39 F. Supp. 2d. at 1364-65; *Hipp*, 29 F. Supp. 2d. at 1335. In all other respects, the court entered judgment in accordance with the jury's verdicts.

Liberty National moved for judgment as a matter of law (JMOL) both during and after trial, and filed motions for remittitur and new trial after entry of judgment. The district court denied Liberty National's motions, except to the extent that it remitted some of the damages. *Hipp*, 65 F. Supp. 2d. at 1345.

Liberty National raises the following issues on appeal: (1) the district court erred in permitting a collective action in this case; (2) the district court erred in denying Liberty National's motions for judgment as a matter of law on Plaintiffs' pattern and practice claims; (3) the district court erred in denying Liberty National's motions for judgment as a matter of law on the Plaintiffs' individual claims; (4) the district court erred in denying Liberty National's motions for judgment as a matter of law as to liquidated damages; and (5) the district court erred in denying Liberty National's motion to remit the jury's verdicts.

For the reasons stated in Part I of this opinion, we affirm the district court's judgment on the propriety of a collective action, but we reverse as to the temporal scope of the action. For the reasons stated in Part II, we reverse the pattern and practice finding, and we reverse the verdicts in favor of the individual Plaintiffs. In light of our disposition regarding the verdicts, we need not address Liberty National's arguments pertaining to the damages awarded in this case.

DISCUSSION

## I. OPT-IN COLLECTIVE ACTIONS UNDER 29 U.S.C. § 216(b)

### A. Introduction and Background

Plaintiffs wishing to sue as a class under ADEA must utilize the opt-in class mechanism provided in 29 U.S.C. § 216(b) instead of the opt-out class procedure provided in Fed. R. Civ. P. 23. *See Grayson*, 79 F.3d at 1102 (citing *Price v. Maryland Cas. Co.*, 561 F.2d 609, 610-11 (5th Cir. 1977)).[6] In a Rule 23 class action, each person who falls within the class definition is considered to be a class member and is bound by the judgment, favorable or unfavorable, unless he has opted out. Fed. R. Civ. P. 23(c)(3); *Grayson*, 79 F.3d at 1106. By contrast, a putative plaintiff must affirmatively opt into a § 216(b) action by filing his written consent with the court in order to be considered a class member and be bound by the outcome of the action. § 216(b); *Grayson*, 79 F.3d at 1106; *see also LaChappelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288-89 (5th Cir. 1975) (recognizing this "fundamental" difference between Rule 23 class actions and § 216(b) class actions).

---

[6]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

To maintain an opt-in class action under § 216(b), plaintiffs must demonstrate that they are "similarly situated." § 216(b); *Grayson*, 79 F.3d at 1093. In subpart B, we will clarify the meaning of § 216(b)'s "similarly situated" requirement in this circuit. We will also suggest an approach for district courts to use in considering certification of ADEA opt-in classes.

This case also requires us to consider application of the piggybacking rule to ADEA opt-in classes under § 216(b). As a general rule, an employee who wishes to sue his employer for age discrimination must first file an administrative charge of discrimination with the EEOC. Under the piggybacking rule, however, a putative plaintiff who has not filed his own EEOC charge may "piggyback" his claim onto the claim of a plaintiff who has filed a timely charge. *Grayson*, 79 F.3d at 1101; *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450 (11th Cir. 1993). We have specifically held that the piggybacking rule is applicable to ADEA cases. *Grayson*, 79 F.3d at 1101. In so holding, we adopted the two requirements used in Title VII piggybacking cases: A plaintiff may piggyback on another plaintiff's charge provided "'(1) the relied upon charge [to which he is piggybacking] is not invalid, and (2) the individual claims of the filing and non-filing plaintiff [the named filing plaintiff and the piggybacking plaintiff] arise

9

out of similar discriminatory treatment in the same time frame.'" *Id.* at 1101-02 (quoting *Calloway*, 986 F.2d at 450).

The parties agree Plaintiff Stein filed the representative charge in this case, and they agree his charge was valid. They disagree, however, as to the precise meaning of the second requirement, and we must therefore now determine the scope of the statement "in the same time frame." In subpart C, we address the appropriate temporal scope of an ADEA opt-in collective action.

B.  "Similarly situated" requirement

We first must determine whether Plaintiffs were "similarly situated" as required to create an opt-in class under § 216(b). We review the district court's decision that a collective action was proper because Plaintiffs were similarly situated for abuse of discretion. *See Grayson*, 79 F.3d at 1097; *see also Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1388 (11th Cir. 1998) (en banc).

For an opt-in class to be created under § 216(b), a named plaintiff must be suing on behalf of himself and other "similarly situated" employees.[7] "'[P]laintiffs

---

[7] "An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is

need show only that their positions are similar, not identical, to the positions held by the putative class members.'" *Grayson*, 79 F.3d at 1096 (quoting *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988), *aff'd in part and appeal dismissed in part*, 862 F.2d 439 (3d Cir. 1988), *aff'd*, 493 U.S. 165, 110 S. Ct. 482 (1989)).

Liberty National claims the district court should have used a two-tiered approach in making the similarly situated determination. Under this approach, during the early stages of litigation, the district court would have evaluated the case under a lenient standard and likely would have granted preliminary certification of an opt-in class. The court would then have re-evaluated the similarly situated question at a later stage, once discovery produced more information regarding the nature of Plaintiffs' claims.

In *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207 (5th Cir. 1995), the Fifth Circuit, while finding it unnecessary to decide which methodology district courts should use in making ADEA class certification decisions, *see id.* at 1216, described the two-tiered approach used by the district court in that case:

> The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision–usually based only on the

---

brought." 29 U.S.C. § 216(b).

11

pleadings and any affidavits which have been submitted–whether notice of the action should be given to potential class members.

Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.

The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives–i.e. the original plaintiffs–proceed to trial on their individual claims. Based on our review of the case law, no representative class has ever survived the second stage of review.

*Id.* at 1213-14 (internal footnote omitted).

Liberty National sought to have the district court utilize the two-tiered approach in this case, but the district court declined to do so. If the court had employed this approach, Liberty National contends, the proper result would have been decertification of the class after discovery because of the individualized nature of Plaintiffs' claims. *See, e.g., Thiessen v. Gen. Elec. Capital Corp.*, 996 F. Supp. 1071, 1083 (D. Kan. 1998) (conditionally certifying opt-in class), and *Thiessen v. Gen. Elec. Capital Corp.*, 13 F. Supp. 2d 1131, 1141 (D. Kan. 1998) (decertifying opt-in class and dismissing claims of opt-in plaintiffs); *see also*

12

*Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 353-54 (D.N.J. 1987) (utilizing two-tiered approach to class certification), *mandamus granted in part, appeal dismissed*, *Lusardi v. Lechner*, 855 F.2d 1062, 1080 (3d Cir. 1988), *on remand*, *Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 464 (D.N.J. 1988); *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678-79 (D. Colo. 1997) (same); *Bayles v. Am. Med. Response of Colorado*, 950 F. Supp. 1053, 1066-67 (D. Colo. 1996) (same); *Brooks v. BellSouth Telecomm., Inc.*, 164 F.R.D. 561, 568 (N.D. Ala. 1995) (endorsing the two-tiered approach), *aff'd mem.*, 114 F.3d 1202 (11th Cir. 1997).

After the district court substantially denied Liberty National's motion for summary judgment, Liberty National filed a "Motion for Certification of Interlocutory Appeal of July 28, 1997, Order and Alternate Motion for Reconsideration." Liberty National also filed a motion to sever the cases pursuant to Fed. R. Civ. P. 42(b). The district court denied these motions. In denying the motion to sever, the district court noted that the similarly situated requirement is not very stringent in this circuit.

This Court expressed its view of the similarly situated requirement in *Grayson*: "[T]he 'similarly situated' requirement of § 216(b) is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." 79 F.3d at 1095. "[A] unified policy, plan, or scheme of

13

discrimination may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b)." *Id.* "[P]laintiffs bear the burden of demonstrating a reasonable basis for their claim of classwide discrimination. The plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Id.* at 1097 (internal citations and quotation marks omitted).

The two-tiered approach to certification of § 216(b) opt-in classes described above appears to be an effective tool for district courts to use in managing these often complex cases, and we suggest that district courts in this circuit adopt it in future cases. Nothing in our circuit precedent, however, requires district courts to utilize this approach. The decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court. *See Grayson*, 79 F.3d at 1097 (§ 216(b) class); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000) (Rule 23 class), *cert. denied*, 121 S. Ct. 1354 (2001). It may have been prudent for the district court in this case to have decertified the class upon defendant's motion, but we

cannot reverse the decision unless we find the district court abused its discretion.[8]

Given the flexibility of the similarly situated requirement under *Grayson*, we cannot find the district court abused its discretion in allowing the opt-in class in this case.

Liberty National emphasizes that Plaintiffs in this case worked in different geographical locations. This factor is not conclusive. The plaintiffs in *Grayson* worked in several states, and the court still held that they met the similarly situated requirement. 79 F.3d at 1091. Liberty National also argues that each Plaintiff's case was unique and required an individual analysis of his or her working conditions. Like the plaintiffs in *Grayson*, however, Plaintiffs in this case all held the same job title, and they all alleged similar, though not identical, discriminatory treatment. *See id.* at 1098-99.

C. Temporal Scope

We next must determine whether the opt-in Plaintiffs have met the "in the same time frame" requirement such that they can properly piggyback their claims

_____

[8]In *Grayson*, the defendant challenged the district court's failure to hold an evidentiary hearing before certifying the class. There we stated that the district court does not abuse its discretion in failing to hold an evidentiary hearing before certifying a class "unless the parties can show that the hearing, if held, would have affected their rights substantially." 79 F.3d at 1099.

onto Stein's EEOC charge. Specifically, Liberty National claims (1) Plaintiff Lee should have been excluded because he did not fall within the appropriate rearward temporal scope of the action, and (2) Plaintiffs Carter, Tuggle, and Agee should have been excluded because they did not fall within the appropriate forward temporal scope.

At oral argument, Liberty National argued the district court's decisions regarding the temporal scope of the collective action should be reviewed *de novo.* Plaintiffs argue the standard of review is abuse of discretion. We agree with Liberty National that, since the issue is analogous to a statute of limitations issue, the standard of review is *de novo. See Atlantic Land & Improvement Co. v. United States*, 790 F.2d 853, 857 (11th Cir. 1986) (noting that district court's application of statute of limitations, as a question of law, is reviewed *de novo*).

### 1. Appropriate Rearward Scope

Liberty National claims Plaintiff Lee should not have been allowed to participate in the opt-in collective action because his claim was time-barred. Plaintiff Lee retired from his position as District Manager in Anniston, Alabama, on December 1, 1993, more than a year before Plaintiff Stein filed the representative charge in this case. Since Alabama is a non-deferral state, Plaintiff Lee had only 180 days from December 1, 1993, to file a charge of discrimination

16

with the EEOC. Plaintiff Lee did not file a charge, and he could not have filed one on December 9, 1994, the date Plaintiff Stein filed the representative charge in this case.

Liberty National claims *Grayson* established that the rearward scope of an ADEA opt-in action is 180 or 300 days (depending on whether the putative opt-in plaintiff resides in a deferral or a non-deferral state) before the filing of the representative charge. *Grayson* did not, however, establish such a rule. Instead, the *Grayson* plaintiffs conceded such a rearward cut-off date should apply. *See* 79 F.3d at 1101, nn.26-27 and accompanying text.

Liberty National emphasizes the *Grayson* court's statement that misapplication of the piggybacking rule would "virtually eliminate the statute of limitations for opt-in plaintiffs in ADEA actions." 79 F.3d at 1107. We recognize that the Court made this statement in the context of determining that the filing of an opt-in plaintiff's written consent to opt into the action, rather than the filing of the original complaint in the action, serves to toll the statute of limitations on that plaintiff's ADEA claim. The same concept is, however, involved in this case. Here, the concern is that plaintiffs would be able to revive stale claims for which they failed to file EEOC charges. "The purpose of the requirement that a plaintiff file an EEOC charge within 180 days (or 300 days in a deferral state) of the

17

allegedly illegal act or practice is (1) to give the employer prompt notice of the complaint against it, and (2) to give the EEOC sufficient time to attempt the conciliation process before a civil action is filed." *Id.* at 1102-03. While the issue of the proper rearward scope of the action was not directly before the court in *Grayson*, we believe the rule adopted by the parties in that case is the appropriate one to serve these purposes. We therefore hold the rearward scope of an ADEA opt-in action should be limited to those plaintiffs who allege discriminatory treatment within 180 or 300 days before the representative charge is filed. Plaintiff Lee's claim is procedurally barred because it arose before the "piggybacking window" opened in Alabama, a non-deferral state.[9]

---

[9]The parties agree Plaintiff Stein's December 9, 1994, charge is the representative charge in this case. Plaintiff Hipp filed his charge on June 23, 1994, but Plaintiffs conceded at oral argument that the district court determined Hipp's charge was timely under the FCRA but untimely under ADEA. *See Hipp*, 39 F. Supp. 2d. at 1364 (jury determined Hipp had suffered an adverse employment action within 365 days before his charge, but not within 300 days before it). Plaintiffs do not appeal this finding. At any rate, for purposes of this appeal, it makes no difference whether opt-in Plaintiffs could have piggybacked on Plaintiff Hipp's charge. Plaintiff Lee (who resided in Alabama, a non-deferral state) retired on December 1, 1993. More than 180 days therefore passed between Lee's retirement and the filing of Hipp's charge on June 23, 1994. Put another way, Lee "could not have filed a timely charge" on the date Hipp filed his charge. *Levine*, 700 F. Supp. at 957. Furthermore, we do not believe Hipp's charge was sufficient to alert the EEOC or Liberty

18

Other courts that have addressed this issue have come to the same conclusion. *See, e.g., McDonald v. United Airlines, Inc.*, 587 F.2d 357, 361 (7th Cir. 1978) (holding that the rearward scope must be defined by going back 90 days (the then-existing EEOC charge-filing period) from the date of the earliest-filed charge).[10] In *McDonald*, the Seventh Circuit held that the EEOC and the employer were put on notice by intervening plaintiffs' EEOC charges, which were filed earlier than the named plaintiffs' charges. *See id.* The court left room for the fact that continuing discovery in that case "might turn up a prior EEOC charge, thus resulting in a different tolling date." *Id.* at 361 n.10. The court refused, however, to hold the employer liable for discrimination that occurred before the employer and the EEOC were on notice and could therefore attempt to resolve the issue through conciliation. *See id.* at 360-61; *see also, e.g., Thiessen*, 996 F. Supp. at

---

National of the class nature of the claims. *See Grayson*, 79 F.3d at 1104-05; *see also infra* text accompanying notes 19-20.

[10]We recognize that *McDonald* is a Title VII case. 587 F.2d at 358. The purposes underlying ADEA and Title VII, specifically their respective requirements that employees file charges of discrimination with the EEOC so that the employer can attempt to resolve the issue through conciliation, are similar. We therefore look to Title VII cases as well as ADEA cases in examining this issue. *Cf. Fountain v. Metcalf, Zima & Co.*, 925 F.2d 1398, 1399 (11th Cir. 1991); *EEOC v. Reno*, 758 F.2d 581, 583-84 (11th Cir. 1985).

1076-77 (holding that "the single-filing rule is properly applied only to those individuals who could have filed timely EEOC charges at the time [the representative plaintiff] actually filed his charge"); *Brooks*, 164 F.R.D. at 570 (same); *Church v. Consol. Freightways, Inc.*, 137 F.R.D. 294, 309 (N.D. Cal. 1991) (same); *Levine v. Lane Bryant*, 700 F. Supp. 949, 957 (N.D. Ill. 1988) (same); *Walker v. Mountain States Tel. & Tel. Co.*, 112 F.R.D. 44, 47 (D. Colo. 1986) (same); *cf. Larkin v. Pullman-Standard Div., Pullman, Inc.*, 854 F.2d 1549, 1562-65 (11th Cir. 1988) (suggesting liability dates from 180 days prior to filing of earliest EEOC charge), *vacated on other grounds sub nom.*, *Pullman-Standard, Inc. v. Swint*, 493 U.S. 929, 110 S. Ct. 316 (1989).

Plaintiffs argue even if Plaintiff Lee's claim otherwise falls outside the rearward scope of the class, the continuing violation doctrine revives it. As noted above, it is undisputed that no action was taken against Lee during the charge-filing period. Some cases hold that the continued enforcement of a discriminatory policy against an individual plaintiff constitutes a continuing violation such that the individual plaintiff may sue on otherwise time-barred claims as long as one act of discrimination has occurred against that individual during the statutory period. *See Jenson v. Eveleth Taconite Co.,* 130 F.3d 1287, 1303 (8th Cir. 1997); *Roberts v. North Am. Rockwell Corp.*, 650 F.2d 823, 826-28 (6th Cir. 1981) (in failure-to-hire

context, violation was continuing because plaintiff, after being rejected because of her sex, made several more unsuccessful attempts to apply for job). These courts held that claims of discrimination were not time-barred because some acts of discrimination against the individual plaintiffs had occurred within the statutory period, even though prior acts did not. The earlier acts of discrimination were actionable because they were part of a continuing violation. We can find no authority, however, for allowing one plaintiff to revive a stale claim simply because the allegedly discriminatory policy still exists and is being enforced against others. *See, e.g., Woodburn v. LTV Aerospace Corp.*, 531 F.2d 750, 751 (5th Cir. 1976); *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir. 1985) ("[S]everal courts have held that an employee who has been discharged pursuant to a discriminatory policy may not take advantage of later discriminatory acts against other employees for the purpose of postponing the running of the statutory period as to him on a continuing violation theory.").

Even if the continuing violation doctrine could be read broadly enough to preserve otherwise stale claims of all class members as long as the illegal policy is being enforced against some members of the class, allowing it to save Plaintiff Lee's claim in this case would contravene the doctrine's purpose. The continuing violation doctrine is premised on "the equitable notion that the statute of

21

limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." *Alldread v. City of Grenada*, 988 F.2d 1425, 1432 (5th Cir. 1993) (internal quotation marks omitted). This circuit and others have recognized this underlying premise in holding that "[a] claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period." *Roberts v. Gadsden Mem. Hosp.*, 850 F.2d 1549, 1550 (11th Cir. 1988); *see also Carter v. West Publ'g Co.*, 225 F.3d 1258, 1264 (11th Cir. 2000); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994) ("[T]he purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred.") (citing *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 282 (7th Cir. 1993)); *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1415 n.6 (10th Cir. 1993) ("[I]f an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the EEOC with respect to that event or series of events."); *Berry v. Bd. of Supervisors*, 715 F.2d 971, 981 (5th Cir. 1983) (In

22

determining whether a continuing violation exists, courts should consider whether "the [alleged discriminatory] act [has] the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate.").

Plaintiff Lee testified he suspected age discrimination when he resigned in 1993. He claimed Regional Vice President Andy King was harassing him and making age-based comments, and Lee felt he was being forced to retire. During his direct examination at trial, Lee testified that, at the time he left the company, he felt King's harassment was based on Lee's age.[11] The *Gadsden Memorial* rationale therefore applies here, and Lee may not rely on the continuing violation doctrine to revive his stale claim of age discrimination.[12] Plaintiff Lee should not have been

---

[11]At oral argument, counsel for Plaintiffs argued Lee did not "put two and two together" and realize he had been discriminated against until several months after he left the company. In light of the fact that Lee testified that King told him he needed to retire because he was too old, it is difficult to believe Lee did not suspect age discrimination at the time he retired.

[12]In *Gadsden Memorial*, the individual plaintiff was trying to revive an old claim by asserting that it was sufficiently connected to a timely action as to constitute a continuing violation. 850 F.2d at 1550.

permitted to opt into this action, and the jury verdict in his favor must be reversed.[13]

---

We held that since the plaintiff had slept on his rights, he could not revive the old claim, regardless of its connection to the timely claim. Like *Gadsden Memorial*, most cases involving continuing violations involve claims of discrimination against the same individual, not another member of the class. Even the cases cited by Plaintiffs do not support such a broad reading of the continuing violation theory. *See, e.g., Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 614 (10th Cir. 1988). In *Gray*, the Tenth Circuit held that where an employee continues to be affected by a discriminatory policy but fails to file a charge because he fears reprisal by his employer, the continuing violation doctrine allows him to file a charge encompassing otherwise untimely claims. *Id.* The court further held, however, that once an employee leaves the company, he must comply with the charge-filing period, and the continuing violation doctrine will no longer save a late claim:

> Once an employee is terminated, . . . he must file a charge with the EEOC within 180 days of his termination; otherwise, his ADEA action will be time barred. When an employee is terminated, the employment relationship ends; and the fear of reprisal and the reasons for allowing employees to claim a continuing discriminatory policy are removed. *Moreover, if former employees were allowed to assert charges after 180 days had passed from the date of termination, the purpose of the statute of limitations would be undermined and employers could be exposed to unlimited suits.*

*Id.* (emphasis added).

[13]Plaintiffs also assert Lee's claim should be saved by equitable tolling because Liberty National deceived Lee as to its discriminatory purpose. Since Lee suspected age discrimination at the time he resigned, equitable tolling cannot apply to save his claim. *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428,

24

### 2. Appropriate Forward Scope

Liberty National argues Plaintiffs Carter, Tuggle, and Agee should not have been allowed to opt into the action because their claims arose after the forward scope of the action should have been cut off.

Plaintiff Carter was District Manager in Roanoke, Alabama, until July 1994, when he took medical leave. At that point, he was replaced by Plaintiff Agee, who was older than Carter. One year later, Carter expressed interest in returning to his position, but Agee was still District Manager.[14] Liberty National reassigned Carter to a sales manager position in Opelika, Alabama, and Carter resigned. Carter did not file a charge of age discrimination with the EEOC, and he could not have filed one on December 9, 1994, the date Plaintiff Stein filed the representative charge in this case.

---

1435-36 (11th Cir. 1998) (suggesting equitable tolling might apply if a claimant has no reason to believe he has been the victim of unlawful employment discrimination, but finding the plaintiff in that case knew he was the victim of discrimination).

[14]On September 22, 1994, Agee wrote a letter to Regional Vice Presidents Steve Sexton and Andy King, stating Carter had badly mismanaged the district.

25

Plaintiff Agee was fired from his position as District Manager in Roanoke, Alabama, in June 1996.[15]  Agee did not file a charge of discrimination with the EEOC, and he could not have filed one on December 9, 1994.

Plaintiff Tuggle resigned from his position as District Manager in Tullahoma, Tennessee, in December 1995, at age 43.  Tuggle was replaced by Donnie Ventress, who was older than Tuggle.  Tuggle did not file a charge of age discrimination with the EEOC, and he could not have filed one on December 9, 1994.

Liberty National claims the forward scope of this action should have been cut off on the day Stein (the representative plaintiff) left Liberty National.  In the alternative, Liberty National contends the forward scope should have been cut off on the day Stein filed the representative charge, or, at the latest, on the day the complaint was filed in this case.  Plaintiff Stein resigned from Liberty National on July 29, 1994, and he filed his EEOC charge on December 9, 1994.  The original complaint in this case was filed on June 22, 1995, and the amended complaint was filed on October 5, 1995.  Plaintiff Carter resigned from Liberty National in July 1995; Plaintiff Tuggle resigned in December 1995; and Plaintiff Agee's

---

[15]Liberty National alleges Agee was fired for issuing a receipt on the back of a business card, in violation of company policies.

employment was terminated in June 1996. Under Liberty National's theory, then, all three of these Plaintiffs should have been barred from joining the collective action.

Liberty National relies on *Jones v. Firestone Tire & Rubber Co.*, 977 F.2d 527, 532 (11th Cir. 1992), a Title VII case in which this Court recited the district court's decision that the representative charge could be relied on by non-filing plaintiffs whose claims arose between the date 180 days before the representative charge was filed and the date of the representative plaintiff's departure from the company. *See id.* at 532. The temporal scope of that case was not, however, an issue in the appeal. This Court therefore had no occasion to pass on the correctness of the district court's decision in that respect. *See id.*[16]

Liberty National argues that if the piggybacking window did not close the day Stein left the company, it closed the day he filed his EEOC charge. Liberty National finds support for this position in *Grayson*. In finding plaintiff Grayson's EEOC charge could not be the representative charge in that case, the Court noted that Grayson's charge did "*not* put the EEOC on notice of demotions occurring

---

[16]We note the tone of the opinion suggests the Court found the district court's decision reasonable, and perhaps even assumed it to be correct.

*afte*r [its] filing." *Grayson*, 79 F.3d at 1104.[17]  The Court noted that if Grayson's

charge were used as the representative charge, putative plaintiffs demoted after the

date it was filed could not opt into the class.  *See id.*[18]  This language suggests the

Court would have considered plaintiffs who were demoted after Grayson was

demoted, but before Grayson filed his EEOC charge, able to opt in, undermining

Liberty National's argument that the cut-off date is the date the representative

plaintiff leaves the company.  It also, however, strongly suggests the Court agreed

with Liberty National's alternative argument that the forward scope of the opt-in

class should be cut off on the date the representative charge was filed.

---

[17]The Court's primary reason for finding Grayson's charge inadequate was that Grayson's own action was time-barred, so he should not have been allowed to participate in the action.  Since he should not have been involved in the action, his charge could not serve as the representative charge for other plaintiffs. *Grayson*, 79 F.3d at 1104.

[18]Despite the fact that the appeal bore *Grayson*'s name, Grayson himself was an opt-in plaintiff, not a named plaintiff.  79 F.3d at 1092.  The district court dismissed *Grayson*'s original complaint, noting that all plaintiffs in that case were also members of the class in a separate action, *Helton*.  *Id.*  The district court assumed the *Grayson* plaintiffs would want to opt into the *Helton* action, and provided that their cases could be re-opened if they were later excluded from the *Helton* class.  *Id.*  The class at issue in the *Grayson* appeal was actually the *Helton* class, in which Grayson was an opt-in, not a named, plaintiff.  *Id.*

28

The Court in *Grayson* went on to select the charge of plaintiff Kempton, which was "the first timely filed charge of one of the named plaintiffs that gives adequate notice of the scope of the class." *Id.* at 1104-05.[19] *See also Walker*, 112 F.R.D. at 47 ("The latest date on which potential plaintiffs may claim discrimination occurred is also circumscribed by [the representative] charge. . . . The EEOC could not have been expected to perform its conciliatory function for alleged acts of discrimination which could have occurred long after [the representative] charge was filed and of which no notice was given."); *Griffin v. Casey*, 42 Fair Empl. Prac. Cas. (BNA) 1423, 1429 (M.D. Fla. Jan. 20, 1987) ("[T]he fact that the present case involves a class action should not expand the temporal scope of the claims that would otherwise be heard if Griffin had litigated alone.").

---

[19]Before trial in this case, the district court found Hipp's charge to be timely. *Hipp*, 973 F. Supp. at 1038. Liberty National claims it was untimely, and Plaintiffs conceded at oral argument that it was untimely under ADEA, but timely under the FCRA. Regardless of its timeliness, Hipp's charge did not put the EEOC and Liberty National on notice of the collective nature of the claims, so it cannot serve as the representative charge.

While the issue was not squarely before this Court in *Grayson*, our statement

as to the inadequacy of Grayson's charge[20] supports the view that the forward

---

[20]We find no material basis on which to distinguish
Stein's charge from Grayson's.   In *Grayson*, plaintiff Grayson's
charge made the following allegations:

> For the past five years, the Company has systematically [retired or] demoted managers in the protected age group and replaced them with younger managers.

79 F.3d at 1104.

In this case, Plaintiff Stein's charge makes the following allegations:

> I believe Liberty National, C.B. Hudson and Andy King have violated my rights, as well as the rights of both older workers and applicants, under the Age Discrimination in Employment Act and the Florida Civil Rights Act of 1992.  Liberty National, C.B. Hudson and Andy King have implemented a uniform practice and policy of age discrimination by forcing older employees to retire, take demotions, terminating them, and\or subjecting them to continued harassment, abuse, and discriminatory policies and practices.

Both charges alleged that other employees were affected by the policies. Grayson's charge alleged that older managers had been "systematically" discriminated against, while Stein's alleged "a uniform practice and policy of age discrimination."  Stein's charge, like Grayson's, did not explicitly allege that the violation was continuing.  (While Stein's charge did allege "continued harassment," we read that allegation to mean the "harassment" was "continued" during Stein's employment, not that it was "continuing" after Stein left Liberty National).   Stein's charge also did not explicitly allege that the policy ended on the day his employment ended (or on the day he filed the charge), but neither did Grayson's, and the Court there believed it was inadequate to notify the EEOC of discrimination occurring after the charge was filed.  *Grayson*, 79 F.3d at 1104.  If opt-in plaintiffs whose claims arose after Grayson's charge was filed could not opt in on the basis of his charge, we do not see how opt-in plaintiffs whose claims

30

scope of an opt-in class ends on the date the representative charge is filed. We agree that this rule is the proper one, and we adopt it today. This rule is consistent with the purposes of requiring putative ADEA plaintiffs to file charges with the EEOC. As stated above, the charge-filing requirement is designed to put the EEOC and the employer on notice of the allegations. The objective of the piggybacking rule is to allow non-filing plaintiffs to rely on the charges of filing plaintiffs when it would be a "useless act" for the non-filing plaintiffs to file their own charges. *Grayson*, 79 F.3d at 1103 (internal quotation marks omitted). It is not, however, "useless" for plaintiffs with claims arising after the representative charge is filed to file their own charges. On the contrary, such filing is necessary to remain faithful to the overriding purpose of the charge-filing requirement: notifying employers and the EEOC of the allegations in a timely manner.

Plaintiffs allege the claims of Carter, Tuggle, and Agee "related to and grew out of" the allegations in Stein's EEOC charge, and these Plaintiffs therefore should have been allowed to opt into this action under a continuing violation theory. Indeed, there is some authority supporting this position. *See, e.g., McDonald*, 587 F.2d at 361 (permitting opt-in of plaintiffs discharged after

_____

arose after Stein's charge was filed could properly opt in on the basis of Stein's charge.

31

representative charges were filed but before discriminatory rule was abolished); *Church*, 137 F.R.D. at 309 (The rule that "the latest date upon which a potential class member must have been able to file is defined by the date of the last filed EEOC charge" does not apply "where acts of ongoing discrimination in furtherance of an earlier implemented plan are alleged."); *Levine*, 700 F. Supp. at 957 (representative charge "put [the employer] on notice that someone was challenging its alleged age discrimination"). Most of the cases Plaintiffs cite, however, do not establish that one plaintiff may opt into an action because his claims of discrimination relate to allegations made in an EEOC charge filed by another plaintiff. *See Turner v. Orr*, 804 F.2d 1223, 1226 (11th Cir. 1986) (Title VII complaint may allege incidents that occurred during the pendency of an EEOC charge if the incidents could reasonably be expected to "grow out of" the allegations in the charge); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465-67 (5th Cir. 1970) (same). It makes sense to allow an individual plaintiff to include in his complaint allegations of conduct occurring after the representative charge is filed, as long as that conduct relates to the conduct alleged in the charge. For example, in *Turner*, the plaintiff's EEOC charge generally alleged the company had failed to promote him, and he wanted to include in his complaint allegations that he had not received a specific promotion. 804 F.2d at 1226-27. In such a

32

case, the EEOC and the employer can reasonably be expected to be on notice that

the plaintiff will challenge the employment decision. Here, however, the actions

about which Carter, Lee, and Tuggle complained occurred well after Stein filed his

charge. A single charge cannot be expected to put the EEOC and employer on

notice that general policies as applied to different individuals in different offices

are being challenged indefinitely.[21]

Where the representative charge clearly alleges a continuing, concrete policy

that is illegal, as in *McDonald*, it might be fair to assume the company has

knowledge of later-arising claims challenging the same policy. *See, e.g., Bush v.*

*Liberty Nat'l Life Ins. Co.*, 12 F. Supp. 2d. 1251, 1258-59 n.11 (M.D. Ala. 1998),

*aff'd mem.*, 196 F.3d 1261 (11th Cir. 1999) (continuing violation must be "clearly

asserted both in the EEOC filing and in the complaint") (quoting *Miller v. Int'l Tel.*

---

[21]Stein's charge alleges that a rather nebulous practice and policy of harassment was implemented by Hudson and King. The testimony centered around King's behavior, and the district court found King "predominantly carried out the harassment." *Hipp*, 29 F. Supp. 2d. at 1317. King apparently left the company in early 1995. Plaintiff Carter resigned in July 1995; Plaintiff Tuggle resigned in December 1995; and Plaintiff Agee's employment was terminated in June 1996. Based on these facts, even if we were to accept Plaintiffs' "relate to and grow out of" theory, it is uncertain whether these claims would qualify.

*& Tel. Corp.*, 755 F.2d 20, 25 (2d Cir. 1985)).  Since we are not faced with such a

case, we need not decide that more difficult issue today.[22]

The forward cut-off date in this case should have been December 9, 1994,

the date Plaintiff Stein filed his charge.  Plaintiffs Carter, Tuggle, and Agee should

---

[22]In *McDonald*, the defendant, United, had an explicit discriminatory policy: a no-marriage rule for flight attendants.  587 F.2d at 358.  It was certainly reasonable to expect United to be on notice, from the filing of the first charge, that it could expect flight attendants to continue challenging the policy until the policy was withdrawn.  In such a case, it may well be futile to require putative plaintiffs to file repetitive charges challenging the same well-defined plan.  "The principle behind the piggybacking rule is to give effect to the remedial purposes of the ADEA and to not exclude otherwise suitable plaintiffs from an ADEA class action simply because they have not performed the 'useless act of filing a charge.'" *Grayson*, 79 F.3d at 1103 (citations omitted).  We think the act of filing a charge, though, can only be said to be "useless" when the charge on which a plaintiff purports to rely clearly puts the EEOC and the employer on notice that the plaintiff is likely to assert a claim.  Such can certainly be said of the *McDonald* plaintiffs whose claims arose after the first EEOC charge was filed.  They were challenging precisely the same concrete policy that had already been brought to the attention of United and the EEOC.  *McDonald*, 587 F.2d at 358.

We recognize that in such cases the line between the "similar discriminatory treatment" and "in the same time frame" requirements becomes somewhat blurred. When plaintiffs so clearly meet the "similar discriminatory treatment" requirement, as in *McDonald*, courts can afford to be somewhat more lenient with respect to the "in the same time frame" requirement, without sacrificing fairness to the employer.

not have been permitted to opt into this action. The jury verdicts in favor of these three Plaintiffs must therefore be reversed.[23]

## II. SUFFICIENCY OF THE EVIDENCE AS TO PLAINTIFFS HIPP, STELL, AND STEIN[24]

Liberty National argues Plaintiffs presented insufficient evidence of a pattern and practice of age discrimination. Liberty National further argues the district court should have granted its motion for judgment as a matter of law (JMOL) on each Plaintiff's claims of age discrimination. We will first address the pattern and practice evidence, and we will then address the Plaintiffs' individual claims. We conclude the case should not have been allowed to proceed as a pattern and practice case. We further conclude the jury verdicts in favor of the individual

---

[23]Liberty National also claims the subject matter of the opt-in class should have been limited to constructive discharge because Stein's EEOC charge alleged only constructive discharge. Plaintiff Agee is the only plaintiff involved in this appeal who does not allege constructive discharge; Agee alleges unlawful termination. Since we hold Agee should not have been allowed to participate in the action because his claim fell outside the proper temporal scope of the class, we need not address this issue.

[24]It is unnecessary for us to consider Liberty National's arguments regarding the claims of Plaintiffs Lee, Carter, Agee, and Tuggle, as we have already found those Plaintiffs should not have been allowed to opt into this action.

Plaintiffs must be reversed because they presented insufficient evidence of constructive discharge in violation of ADEA.

A.  Sufficiency of Pattern and Practice Evidence

Plaintiffs in this case proceeded under a pattern and practice theory of intentional discrimination.[25]  *See generally EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).  In a pattern and practice case, plaintiffs must establish by a preponderance of the evidence not only that the employer discriminated against certain individuals, but that "discrimination was the company's standard operating procedure–the regular rather than the unusual practice."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S. Ct. 1843, 1855 (1977).  To meet this burden, plaintiffs must "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts."  *Id.* (internal quotation marks omitted); *Maddox v. Claytor*, 764 F.2d 1539, 1556-57 (11th Cir. 1985).[26]  When plaintiffs successfully establish a pattern and practice of

_____

[25]The verdict forms required the jury to find whether Liberty National had engaged in a pattern and practice of age discrimination.  The jury answered "yes." The verdict forms also required the jury to find on an individual basis whether "each plaintiff prove[d] by a preponderance of the evidence that he suffered a tangible job detriment, such as discharge, constructive discharge, demotion or loss of substantial job benefits."  The jury answered "yes" as to Hipp, Stell, and Stein.

[26]Plaintiffs need not, however, establish that the employer followed "a *formal* or *express* policy of discrimination."  *Joe's Stone Crab*, 220 F.3d at 1285.

employment discrimination, a rebuttable presumption that each plaintiff was a victim of discrimination obtains, and the burden shifts to the employer to prove that each individual employment decision was not made in furtherance of its illegal policy. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir. 1986) (citing *Teamsters*, 431 U.S. at 359, 97 S. Ct. at 1866). The employer may meet this burden with "clear and convincing evidence that job decisions made when the discriminatory policy was in force were not made in pursuit of that policy." *Id.* (citing *Teamsters*, 431 U.S. at 362, 97 S. Ct. at 1868).

The jury in this case found by a preponderance of the evidence that Liberty National engaged in a pattern and practice of age discrimination. The jury further found that Liberty National did not prove it operated outside the pattern and practice with respect to each of the prevailing Plaintiffs.[27] The jury also found that each prevailing Plaintiff had "suffered a tangible job detriment, such as discharge, constructive discharge, demotion or loss of substantial job benefits."

Plaintiffs proceeding under a pattern and practice theory often introduce statistics to bolster their claims of discrimination. *See, e.g., Teamsters*, 431 U.S. at 339-40, 97 S. Ct. at 1856-57; *Maddox*, 764 F.2d at 1556; *Coates v. Johnson &*

---

[27]The jury found Liberty National did demonstrate it operated outside the pattern and practice as to the three Plaintiffs who did not prevail at trial.

*Johnson*, 756 F.2d 524, 532 (7th Cir. 1985); *In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1084-85 (W.D.N.Y. 1994). Plaintiffs in this case did not introduce statistical evidence at trial.[28] Liberty National urges us to hold Plaintiffs' pattern and practice evidence insufficient as a matter of law because Plaintiffs failed to provide statistical evidence to support their claims. While we note that statistical evidence is often extremely useful, we decline to announce the broad rule Liberty National requests. *See, e.g., Xerox*, 850 F. Supp. at 1085 (the absence of statistical evidence is not always fatal in pattern and practice cases, but when either statistical evidence or anecdotal "evidence is missing altogether, the other must be correspondingly stronger").

We nevertheless do not think this case should have been allowed to proceed as a pattern and practice case. Even assuming the truth of all their allegations, Plaintiffs did not prove that age discrimination was the "standard operating procedure" of the company regarding retention of District Managers. While the

---

[28]Plaintiffs claim they were prepared to introduce statistical evidence based on one of Liberty National's exhibits, but Liberty National withdrew the exhibit. After trial, the district court faulted Liberty National for Plaintiffs' lack of statistical evidence. *Hipp*, 65 F. Supp. 2d. at 1327. Liberty National claims Plaintiffs failed to produce their own statistical analysis and argues it should not be faulted for that failure.

absence of statistical evidence is not necessarily fatal to Plaintiffs' claims, they

presented only vague allegations of a policy of forcing out older District Managers.

Plaintiffs argue on appeal that the evidence at trial showed that "Liberty

National's discriminatory policies emanated from its chief executive officer and

were uniformly enforced by the company's regional vice presidents. Liberty

National's top executives employed a standardized set of harassing tactics and

techniques." Plaintiffs' evidence at trial did not, however, show such a widespread

pattern of discrimination.[29] Rather, Plaintiffs alleged an amorphous "policy" that

was mainly implemented by one man, Andy King.

---

[29]We note that part of the problem in this case is that the pattern and practice framework is inherently ill-suited to cases in which plaintiffs allege constructive discharge. In most pattern and practice cases, plaintiffs challenge the employer's failure to hire or promote employees of a certain class. *See, e.g., Teamsters*, 431 U.S. at 328-29, 97 S. Ct. at 1851 (discriminatory hiring practices); *Cox*, 784 F.2d at 1551-52 (failure to promote; job classification on the basis of gender; wage discrimination). In such cases, the individual employees generally present very similar claims, and they can often point to either a written policy or strong statistical evidence that supports their position. In constructive discharge and hostile environment cases, by contrast, plaintiffs often rely on individualized actions taken against them. Many of the actions about which Plaintiffs complain are individualized. *See discussion infra* II.B. While it might in some other case be appropriate to conclude an employer engaged in a "pattern and practice" of forcing out employees of a certain class, it is not appropriate here, where each Plaintiff relies heavily on individualized and personalized "harassment."

Plaintiff Hipp testified he noticed a pattern of older District Managers leaving the company. He did not, however, know how many District Managers over age 40 remained at Liberty National, and he did not know whether the average age of District Managers had increased or decreased since the alleged policy began. Plaintiff Stell testified he would have stayed at Liberty National if he had been transferred out of King's division. This testimony indicates age discrimination was not Liberty National's "standard operating procedure." Rather, if age discrimination existed at all with respect to the treatment of District Managers, it was apparently confined to King's division.[30]

---

[30]Viewing the evidence in the light most favorable to Plaintiffs, it appears Plaintiffs may have proven it is Liberty National's standard operating procedure to discriminate against older applicants for positions as agents. There was substantial testimony at trial that Liberty National subjected applications from individuals over age 55 for positions as agents to additional scrutiny. (There was some confusion in the testimony as to whether the policy applied to applicants over 55 or applicants over 60). Plaintiffs argue on appeal that the discriminatory hiring policy bolsters their pattern and practice claim. The district court accepted this argument. We do not see, however, how that alleged policy has any relationship to Plaintiffs' claims. That policy, if it existed, concerned *applicants* who were *over age 55* and who applied for jobs as *agents*. Plaintiffs were not subjected to that policy. They were *already employed by Liberty National*. Furthermore, they were all *in their early 40s*, and they worked as *District Managers*. They do not claim Liberty National refused to hire them. Instead, they claim they were constructively discharged from their positions. Further, they do not argue that only District Managers who were over 40 were prohibited from hiring agents over age 55. The policy apparently applied across the board. While it was certainly a deplorable policy to refuse to hire agents over age 55, it simply is not probative of a plan on the part of

40

Based on these facts, we conclude Plaintiffs presented insufficient evidence of a pattern and practice of age discrimination.

B. Individual Constructive Discharge Claims[31]

In reviewing the denial of a motion for JMOL, this Court uses the following standard:

> When considering whether or not a ruling on a motion for directed verdict or for judgment notwithstanding the verdict should be upheld, the standard of review to be applied by this Court is the same as that applied by the district court. Thus, we consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party. If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted. Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury.

It bears repeating that a mere scintilla of evidence does not create a

---

Liberty National to force out District Managers in their early 40s. We also cannot accept Plaintiffs' allegation that this policy created a hostile working environment for all employees over age 40. So holding would mean, in effect, that age discrimination against one employee would give all other employees over 40 a cause of action. ADEA was not meant to be so expansive.

[31]The same discussion applies both to Plaintiffs' claims under ADEA and Plaintiffs' claims under the FCRA. *See Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 n.2 (11th Cir. 1997) (noting that we consider age discrimination claims under FCRA within the same framework used to consider age discrimination claims under ADEA).

jury question. Motions for directed verdict and for judgment notwithstanding the verdict need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in evidence to support a jury question.

*Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989) (footnotes omitted).[32]

Plaintiffs allege they were constructively discharged in violation of ADEA.[33] The fact that we have found Plaintiffs' evidence insufficient as a matter of law to establish a pattern and practice of discrimination does not necessarily mean Plaintiffs are not entitled to relief on their individual claims. *Cf. Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876-78, 104 S. Ct. 2794, 2799-2800 (1984) (judgment in class action that employer had not engaged in pattern and practice of discrimination did not preclude filing of separate individual actions by class members). We will therefore examine Plaintiffs' individual constructive discharge claims.

"[T]he plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal

---

[32]Fed. R. Civ. P. 50(b) has been amended to substitute the term "judgment as a matter of law" for the terms "directed verdict" and "judgment notwithstanding the verdict."

[33]As noted above, Plaintiff Stell apparently alleges both constructive discharge and unlawful termination. Since the district court analyzed his claim as one of constructive discharge, we will do the same.

characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1292 (11th Cir. 1999).[34] *See also Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 n.2 (11th Cir. 1997). We have long recognized that constructive discharge can qualify as an adverse employment decision under ADEA. *See Poole*, 129 F.3d at 553 n.2; *Maddow v. Proctor & Gamble*, 107 F.3d 846, 852 (11th Cir. 1997); *Stamey v. Southern Bell Tel. & Tel. Co.*, 859 F.2d 855, 859-60 (11th Cir. 1988). The jury in this case found that Plaintiffs were constructively discharged in violation of ADEA.[35] The district

_____

[34]The plaintiff must show that an adverse employment action was taken against him regardless of whether he is relying on direct evidence of discrimination or employing the burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), for cases in which only circumstantial evidence is available. *See Wright*, 187 F.3d at 1292.

[35]As to Plaintiffs Hipp and Stein, the jury's special verdict forms contained the following findings, made pursuant to the preponderance of the evidence standard:

(1) Plaintiffs proved they suffered adverse employment actions and age was a        determining factor in those actions.
(2) Plaintiffs proved they were subjected to hostile work environments due to their ages.
(3) Plaintiffs proved age was a determining factor in the work conditions imposed on  them.
(4) Plaintiffs proved their working conditions were so intolerable that reasonable people in       their places would have felt compelled to resign.
(5) Liberty National did not prove it would have treated Plaintiffs the same way if age had      not been a factor.

court denied Liberty National's motion for JMOL on this issue, and Liberty National appeals this denial.

The threshold for establishing constructive discharge in violation of ADEA is quite high. In evaluating constructive discharge claims, we do not consider the plaintiff's subjective feelings. Instead, we employ an objective standard. *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998). "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [his] position would have been compelled to resign.'" *Poole*, 129 F.3d at 553 (quoting *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)).

The standard for proving constructive discharge is higher than the standard for proving a hostile work environment. *Landgraf v. USI Film Prods.*, 968 F.2d

The special verdict form for Plaintiff Stell contained the following findings, made pursuant to the preponderance of the evidence standard:

(1) Plaintiff proved his age was a determining factor in the work conditions imposed on him.
(2) Plaintiff proved he was subjected to a hostile working environment due to his age.
(3) Plaintiff proved his working conditions were so intolerable that a reasonable person in his place would have felt compelled to resign.
(4) Liberty National did not prove it would have treated Plaintiff the same way if age had not been a factor.
(5) Liberty National did not prove Plaintiff unreasonably refused an unconditional offer of full reinstatement and back pay.

427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."), *aff'd*, 511 U.S. 244, 114 S. Ct. 1483 (1994); *see also Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316-18 (11th Cir. 1989) (affirming district court's conclusion that Title VII plaintiffs were subjected to hostile work environment, but were not constructively discharged); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905-06 (11th Cir. 1988) (same).

This circuit has required pervasive conduct by employers before finding that a hostile work environment existed or a constructive discharge occurred. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999) (en banc) (no sex-based hostile work environment where male supervisor (1) told female employee he was "getting fired up;"(2) rubbed his hip against employee's hip while smiling and touching her shoulder; (3) twice made a sniffing sound while looking at employee's groin area; and (4) constantly followed employee and stared at her in a very obvious manner), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674 (2000); *Poole*, 129 F.3d at 553 (issue of fact existed, precluding summary judgment for employer on constructive discharge claim, where plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations

with other workers"); *EEOC v. Massey Yardley Chrysler Plymouth*, 117 F.3d 1244, 1247-48 and nn.2 and 4 (11th Cir. 1997) (affirming jury finding of age-based hostile work environment and constructive discharge where supervisors (1) made offensive comments regarding effects of aging on plaintiff's body; (2) told her she was too old for the clothes she was wearing and should wear "old lady dresses" instead; (3) asked if she was "having any hot flashes;" (4) remarked that she was becoming "senile" or "losing it," and asked "whether Alzheimer's disease was setting in early;" (5) told her she would "just have to get used to" these comments since she "was, after all, 'an old lady'"); *Morgan v. Ford*, 6 F.3d 750, 752, 756 (11th Cir. 1993) (issue of fact as to sex-based constructive discharge where plaintiff's supervisor (1) repeatedly asked her out on dates; (2) constantly "hovered" around her after she turned him down; (3) told her she "had not had a real man until she had him;" (4) made offensive, sexually charged comments; and (5) electronically monitored her conversation); *Hill v. Winn-Dixie Stores*, 934 F.2d 1518, 1527 (11th Cir. 1991) (affirming district court's grant of judgment notwithstanding the verdict because evidence of reprimands, criticism, and supervisor's withdrawal of support was insufficient to prove constructive discharge, especially in light of employer's efforts to remedy the situation after plaintiff's resignation); *Wardwell v. Sch. Bd. of Palm Beach County*, 786 F.2d

46

1554, 1557-58 (11th Cir. 1986) (reversing as clearly erroneous the district court's

finding of sex-based constructive discharge where female plaintiff was passed over

for promotion in favor of less experienced male and was assigned extra duties).[36]

Plaintiff Hipp

Plaintiff Hipp was District Manager in Ft. Myers, Florida, before he resigned

in August 1993 at age 43. On June 23, 1994, Hipp filed an individual charge of

discrimination with the Florida Commission on Human Relations (FCHR). This

charge alleged he was forced to resign because of his age.[37] At trial, he testified

_____

[36]In *Wardwell*, the Court stated, "Although there is
evidence to support the district court's finding of
constructive discharge, because our review of the
evidence leaves us with the definite and firm
conviction that no reasonable person in Wardwell's
position would have felt compelled to resign, we hold
that the district court's finding that Wardwell had
been constructively discharged is clearly erroneous."
786 F.2d at 1557.

[37]Plaintiff Hipp made the following allegations in
his charge:

    I was employed by Liberty National Insurance
    Company from 1-16-78 until I resigned on 08-31-93.
    As a result of management's desire to have younger
    management, I was subjected to continuous
    harassment and felt forced to resign. My job as
    district manager and the performance of my duties
    were made miserable by Andy King (Second Vice-
    President) so that I would be forced to resign. I
    endured changes in policies and procedures and
    constant harassment and criticism by Mr. King.

    I was replaced by a 29-year old with only five

47

that Regional Vice President Andy King, and, to a lesser extent, Regional Vice

President Don Horton, harassed him until he felt he had no choice but to resign.[38]

He said the criticism he received prior to 1991 was constructive and helpful, but

after 1991, "it was nothing but harassment."

Hipp testified that Liberty National's C.E.O., C.B. Hudson, said on at least

one occasion that "older people are harder to get to change," and that King and

Horton made similar statements.[39] Hipp did not allege King and Horton made

years' experience. His district is at the bottom of the company (and has been since he became district manager) in terms of productivity.

I was told by Andy King that I was not to send in applications for individuals over 60-years old.

Patty Herring, Human Resources, returned an applicant's file to me because the applicant was a diabetic. According to Ms. Herring, management would not look at the file or acknowledge they had received the file. I was instructed to tell the applicant he was not hired because another applicant was more qualified. According to Ms. Herring, these instructions came from Mr. Andy King.

[38]Hipp also testified that Horton told him King forced Horton out. According to Hipp, Horton could no longer withstand the pressure King was putting on him.

[39]Plaintiffs claim these statements constituted direct evidence of age discrimination, and, in denying Liberty National's first motion for JMOL, the district court agreed. We need not determine whether these statements constituted direct evidence. Since we conclude Plaintiffs have not established they were

48

these statements in reference to Hipp himself, but rather alleged they were evidence of widespread age animus within the company.

Hipp's claims mainly centered around two confrontations with King, as well as several smaller incidents. Hipp's first confrontation with King occurred at an April 1993 meeting he had with King and Horton.[40] Hipp complained that the meeting was supposed to be in his district office at 8 a.m., but around 8:30 or 8:45, King and Horton called and asked Hipp to meet at a coffee shop instead.[41]

Hipp claimed that at the meeting, in a public area in the restaurant, King "verbally attacked [him] in a manner that [he had] never been spoken to before." Hipp said the attack related to every aspect of his job, but King's main concern was the negative growth rate in Hipp's district at the time. Hipp denied that his growth rate was negative and believed his own numbers were more accurate than King's, but King got very angry when Hipp questioned his numbers. King and Horton told Hipp he should quit if he was unable to do the job. Hipp said he would not quit; they would have to fire him. King and Horton then told Hipp to summon his sales

---

subjected to any adverse employment actions, it does not matter whether they were relying on direct or circumstantial evidence.

[40]Hipp was 43 years old at the time of this meeting.

[41]Hipp testified that he had received several personnel transaction memos (PTMs) from Horton in the weeks before the meeting.

managers to the coffee shop, and, when he complied, King and Horton berated the sales managers in much the same manner as they had Hipp.

Hipp's second confrontation with King concerned a conflict between the two men regarding an agent in Hipp's district who accused another agent and a sales manager of sexual harassment. Hipp disagreed with King about the punishment the accused harassers should receive and thought they were being treated unfairly because the company had not confirmed the harassment.[42] At a weekend retreat, King approached Hipp and told him he wanted to discuss the harassment problem and the "lousy job" Hipp had done in controlling the situation. Hipp wanted to have the conversation at another time because both men had been drinking, but King refused. King berated Hipp and told him he was a "terrible district manager." Hipp walked away, but King followed him. King apologized the next day, but Hipp was upset that the apology was private because the humiliation had been public. Hipp refused to shake King's hand.[43]

ADEA does not guarantee employees a stress-free working environment. While we might disagree with the behavior of Horton and King, we cannot find

---

[42]The sales manager admitted going to the complaining agent's house, uninvited, and taking a nap in her bed.

[43]In addition to these two encounters, Hipp testified that he had several telephone confrontations with Mr. King.

that it rises to the level of constructive discharge in violation of ADEA. *See, e.g., Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1162 (3d Cir. 1993) ("[A] constructive discharge claim based solely on evidence of close supervision of job performance must be critically examined so that the ADEA is not improperly used as a means of thwarting an employer's nondiscriminatory efforts to insist on high standards."); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("Every job has its frustrations, challenges, and disappointments . . . . An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.").

Hipp also complained it was difficult for him to abide by Liberty National's alleged policy of not hiring agents over age 55, because his district, Fort Myers, Florida, had a large elderly population. He talked to Horton about this problem, but Horton said King would not allow Hipp to violate the over-55 policy. Hipp also testified that Horton told him to fire an agent named Wes Adams because Adams was too old.[44] Hipp wanted to allow Adams to work two more years so Adams would receive retirement benefits, and he ultimately succeeded in doing so.

---

[44] Hipp testified Adams was in his 60s at the time.

Hipp also stated that after he was promoted to District Manager, a sales manager in his district, a Mr. Johnson, was giving him trouble. He later found out Mr. Johnson was supposed to be promoted to the District Manager position Hipp received. Horton told Hipp that Johnson was too old to do the job. Horton also made negative comments about the age of Hipp's secretary. Hipp stated that these comments "bothered" him.

The testimony that Liberty National would not allow Hipp to hire agents over age 55 fails to show Hipp was constructively discharged because of his own age, 43. As noted above, this policy did not apply to Hipp. *See supra* note 30. Furthermore, if the policy existed, the evidence is that it applied equally to all districts, and was not implemented to burden Hipp.[45] According to Hipp's testimony, the policy was intended to reduce the company's costs in paying benefits for agents over 55, not to force District Managers in their 40s to leave the company. Similarly, even if Hipp was told to fire Adams because Adams was too old, this testimony does nothing to establish that Hipp was constructively discharged because of his own age. Likewise, the comments regarding Johnson

---

[45] In other words, the policy made it harder for all District Managers, those under 40 as well as those over 40, to hire agents over 55. As noted *supra* note 30, we cannot find that a policy of refusing to hire agents over age 55 created a hostile environment for all current employees over age 40.

and Hipp's secretary, although perhaps offensive, fail to establish that Hipp was subjected to a hostile environment or constructively discharged because of his own age.

Hipp testified about several other alleged indignities he suffered in the latter years of his employment with Liberty National. He complained that agents, Sales Managers, and District Managers began to receive less training after Hudson joined the company, and he began to receive more personnel transaction memos (PTMs) criticizing his performance. He complained that the company began to emphasize bank-budget or bank-draft sales over field-collection sales, but failed to provide any training in this new sales method.[46] Hipp asked King to provide training for the agents, but King told him to train the agents himself. Hipp also complained

---

[46]Hipp also received criticism because his agents were writing too much field collection business. The company told him not to allow agents to write more than 20 percent field collection business each week. Hipp claimed if the agents could not write more than 20 percent field collection business, the office would not have experienced any growth. Although perhaps true, this evidence is irrelevant. Hipp has not alleged that younger District Managers could allow their agents to write higher percentages of field collection business. From the evidence, we can only conclude the change from field collection to bank draft business affected all District Managers. In fact, Hipp himself suggested it was a company-wide policy ("It was during the time we were trying to go from field collection to bank draft. It was-the company was in that mode to get it done.") It is therefore not evidence of age discrimination.

that around 1990 or 1991 the company went to a "growth bonus" instead of a

bonus based on the employee's overall performance. According to Hipp, the new

bonus system was unfair.

Hipp further complained that King cut expenses. He claimed King did not

allow him to have a full-time secretary during part of his employment. He

sometimes had to close the office during the day because he did not have a

secretary, and his business suffered as a result. While it may be true that he was

not allowed to have a full-time secretary, and while this restriction may have been

bad business, Hipp did not testify that younger District Managers were permitted to

have secretaries or in any way connect the company's actions to his age.[47]

Hipp also complained that he was told to cut his lawn service expenses from

$73 per month to $42 per month, the company-wide limit. He claimed it was

impossible to trim that much money off his lawn bill, and he complained to Horton

and King. King refused to make an exception for Hipp, and King said he did not

---

[47]Refusing to allow an employee in Hipp's position to hire subordinates to help him run the office might in some circumstances constitute constructive discharge. For such conduct to qualify as age-based constructive discharge, however, the employee must at a minimum show that employees outside the protected group were treated differently. *See, e.g., Mendoza*, 195 F.3d at 1253 (Edmondson, J., concurring). Hipp has made no such showing here.

care about Hipp's problems.[48] Hipp also testified that his office was in disrepair and needed to be remodeled. He had been trying to get it remodeled since 1986, and when he finally got it remodeled, he was not allowed to make all of the desired repairs. It may have been bad business for the company to cut Hipp's lawn expenses and delay remodeling his office. Perhaps customers were drawn to the office because of its appealing landscaping, or perhaps they were repelled by its state of disrepair. It was not, however, age discrimination. One's working environment does not become objectively intolerable simply because it becomes less attractive.[49]

Hipp also complained that all districts were told to keep their expenses at the same level, even though the needs of the districts varied widely. He was charged for going over the budget on janitorial and landscaping services, even though he did not exceed the total budget for all items. Again, Hipp did not allege that the

---

[48]Hipp canceled the lawn service because the company he used could not do it for $42. Hipp's lawn expenses were restored to their previous level after approximately two months, during which Hipp complained regularly to Horton.

[49]Additionally, Hipp makes no allegation that younger District Managers were not asked to prune their lawn budgets. Such a showing would be essential to establishing that any constructive discharge was based on Hipp's age. *See, e.g., Mendoza*, 195 F.3d at 1253 (Edmondson, J., concurring). Indeed, the testimony suggests the cap on landscaping budgets applied equally to all districts.

expense targets were intended to force older District Managers into retirement, or even that the expense targets had a disproportionately harsh impact on districts run by older District Managers.[50]  Rather, it appears from the testimony that the expense targets applied to all District Managers.  In fact, Hipp admitted on cross-examination that all District Managers were sent a letter stating that they would be financially responsible for any over-budget amounts for janitorial or landscaping services.  The fact that Hipp did not like complying with company-wide budget limitations does not mean he was constructively discharged in violation of ADEA.

Hipp testified he felt forced to resign, but he did not know at the time that age was a factor.  He said the day he left, he did not know why he was not being treated well; his "biggest problem" was that he "could not figure out why" he was being treated poorly.  He discussed his unhappiness with Horton, and Horton told him things were worse in the home office.  Hipp testified that it took him "almost a year" before he could "figure it out–what was going on in the company."  He

---

[50]Hipp also testified that when the districts were ranked, the rankings did not take into account the number of agents in each district, implying that this failure caused his ranking to suffer.  Hipp did not allege the rankings were deliberately skewed to make it appear as though the districts run by older District Managers were not doing well.  Approximately three months before Hipp resigned, Horton sent him a letter stating he was very disappointed in Hipp's ranking because he knew Hipp's ability as a District Manager.

started seeing other older District Managers leaving the company. The more he thought about it, he realized Liberty National was forcing out the older District Managers.[51]

At trial, under examination by his own counsel, Hipp made the following statements:

> Q:   At the time you resigned, were you having physical and emotional reactions to the situation that you were under?
> A:   Yes.
> Q:   Okay. Did you consider those–the situation you were under to be something you could tolerate?
> A:   Yes.
> Q:   And do you consider yourself a reasonable person?
> A:   Yes.

As noted above, to prove constructive discharge, a plaintiff must prove his working conditions are so intolerable that a reasonable person would feel he had no choice but to resign. Hipp stayed for several months after the allegedly discriminatory confrontations, suggesting the confrontations were not so intolerable as to leave him with no choice but to resign.[52] As quoted above, Hipp

---

[51]Hipp's immediate replacement was Forrest Ayers, who is 16 years older than Hipp.

[52]Hipp admitted he was considering leaving the company before his altercations with King. In fact, at that time, he had made a list of the "pros" and "cons" of staying with the company. He also admitted on cross-examination that Regional Vice President Dale Rainey called him after he left and asked him to return to the company, but he refused. On Hipp's termination form,

himself admitted at trial that his working conditions were tolerable. He also testified he did not believe at the time he resigned that he was being discriminated against on the basis of his age. Hipp's termination form indicates he resigned because he did not like the direction in which the company was moving. Most of Hipp's complaints related to King's general management style, and he failed to show that younger District Managers were treated differently.[53] *Cf. Mendoza*, 195 F.3d at 1253 (Edmondson, J., concurring) (sexual harassment plaintiff must prove men were treated considerably differently, and better, in order to prevail).

In light of the foregoing, the finding that Hipp was constructively discharged in violation of ADEA was is not supported by the evidence. The district court

---

the regional vice president wrote that Hipp had above average sales ability, and that he would re-employ Hipp "with a complete turnaround in . . . attitude." The regional vice president gave the following description of Hipp:

> This man has been in the past an asset to the company. Over the last year, he has developed a very poor attitude. With a change in attitude, I think he can be an asset in the future.

[53]Hipp did testify that one younger District Manager, Mark Allen, told him he "really wasn't having a problem with anything." Hipp did not, however, produce any evidence showing that Allen was actually treated differently; Allen could have been subjected to the same treatment, but simply not found it offensive. Alternatively, it might be true that Allen received less criticism than Hipp received, but the record is silent on whether Allen and Hipp were performing at the same level.

should have granted JMOL to Liberty National on Plaintiff Hipp's claims, as he failed to prove he suffered an adverse employment action. The judgment in his favor must therefore be reversed.

Plaintiff Stell

On February 6, 1995, at age 43, Stell tendered his letter of resignation from his position as District Manager in Troy, Alabama.[54] Stell's resignation was to become effective February 17, 1995. On February 14, 1995, King told him he was no longer needed at the company. Stell said that, in his opinion, he was fired.[55] Stell filed a charge of discrimination with the EEOC on February 22, 1995.[56]

---

[54]Stell had previously been District Manager in Brunswick, Georgia. In May or June of 1992, at age 41, Stell requested and received a transfer to Troy, Alabama.

[55]If Stell were claiming unlawful termination, he would also need to claim constructive discharge to collect any significant damages, as the alleged unlawful termination occurred only three days before his resignation was to become effective. (If he was paid through February 17, he would apparently have no monetary damages.) At any rate, we think it doubtful Stell could prevail on an unlawful termination claim merely because he was told he could leave three days before his resignation was to become effective. King signed Stell's notice of termination of personnel, stating that Stell was resigning to accept another job. On this form, King rated Stell's sales ability as very good and indicated he would re-employ Stell.

[56]Stell made the following allegations in his EEOC charge:

Stell testified that he was quite fond of Liberty National until 1993, when the harassment began. According to Stell, Regional Vice Presidents Steve Sexton, King, and Vurl Duce either threatened or harassed him or knew about the threats and harassment. He called Duce and "talked to him about it."

One of Stell's chief complaints was that he received a large number of PTMs from King. He regarded these PTMs as "threats." At trial, however, Stell testified he would write PTMs for the agents in his district when they were not performing well. Stell admitted these PTMs were "no different" from the ones King sent him.

---

I was hired by the company on May 8, 1978 as an Insurance Agent. On February 14, 1995 the above-named employer discharged me. During my employment I had been subjected to constant threats and harassment by my immediate supervisor. On February 6, 1995 I tendered my resignation to the company's president because of the treatment I was being subjected to. I was employed as a District Manager at the time of my termination.

Mr. Andrew King, Senior Vice-President, stated that if I could not work under his supervision, I was fired.

I believe that I have been discriminated against in violation of the Age Discrimination in Employment Act (ADEA) because of my age, 43.

The vice-president has stated that he was seeking younger persons for management with the company. Older long-term employees are being terminated while less productive younger employees are being retained. The person I replaced was given the ultimatum to retire or he would be replaced.

Stell testified he did not regard as a threat language in a PTM he sent one of his agents stating the agent "must have positive growth and maintain a positive, enthusiastic attitude if he is to continue his employment with Liberty National." Stell sent a PTM to another agent stating, "If no improvement is made within the next four weeks, termination is imminent." Stell testified he did regard this language as a threat to the agent's job. He claimed he did not think such language was "justified," but he "wrote something down according to the company's rules and regulations." Stell further admitted at least some of King's concerns about Stell's job performance were valid.[57]

Stell testified that King said at a meeting "that change would be easier to make if we had younger district managers," and King told him that sometimes it was easier to replace employees than to retrain them. King once said Stell "need[ed] to get off [his] fat ass and go to work," and Stell claimed he was "humiliated" by this remark.[58] King called Stell while Stell was in the hospital for

---

[57]Stell claimed he did not like the way King treated him, and he did not know why he was being treated that way. He admitted all of the perceived threats were job related. In a job performance review in which he rated his own performance, Stell rated himself less than satisfactory in district production and premium growth.

[58]Stell testified that King's remark about his weight was a one-time occurrence, and it drove Stell to make the decision to leave Liberty National.

61

suspected heart problems, and, upon finding Stell's condition was not serious, King inquired about the production for that week in Stell's district.[59] Stell also complained that King interrupted Stell while he was meeting with customers. According to Stell, this treatment by King caused him "some severe health problems."

Stell also complained about a trip to a company leadership conference in Cancun. The conference was developed by King. Stell and several other employees "won" this trip. Many of the other employees who "won" the trip were older or even "very much older" than he was. Stell did not go on the trip because it conflicted with his planned family vacation. Stell testified that King was "not real happy with me, and he said that I would never do this to him again." Stell complained about the "harassment and treatment [he] received after" declining to go on that trip. Even if Stell was treated poorly after declining to go on the trip, there is no indication that such treatment was due to his age.

Stell also complained that he had to pay out of his own pocket for a Sales Manager to attend the Cancun trip. He testified that "[u]nder this trip that Mr. King designed and developed, sales managers had to pay out of their pocket for an

_____

[59]Stell admitted on cross-examination that he also received flowers from King and his wife on that occasion.

agent to attend this trip. District managers had to pay for the leading sales manager in the -- their district to attend this trip." Stell did "not feel that [he] should have to personally pay out of [his] pocket to send an agent on a trip that was a company -- or a company-sponsored program."[60] If this was the company policy, and even if it was a bad policy, Stell utterly failed to connect it in any way to age discrimination. In fact, he admitted younger District Managers also had to pay for their Sales Managers to go on the trip.

Stell also testified that the company refused to authorize repairs to his district office. He claimed his office was remodeled about a month after he was replaced by a new District Manager, Cecil Harris, who was in his "late 30s, early 40s." Stell also complained about a "Torch Club" convention he wanted to attend. He was told he would not be invited, but that opt-in Plaintiff Harold Carter would be invited instead, because Carter's district had been experiencing positive growth. When Carter went on sick leave, Stell asked to take his place at the convention, but Stell was not invited. He claimed younger, less productive District Managers were invited. Stell admitted, however, that at least one of the managers in attendance was in his late 50s or early 60s.

---

[60]As noted *infra*, King later offered to reimburse Stell for this expense.

Stell claimed King was "more of a buddy" to the younger District Managers but "more business-like with the older district managers." Even if true, this difference in treatment does not mean Stell was constructively discharged because of his age. It is hardly intolerable for an employee's superior to treat him in a "business-like" manner, even if the employee thinks the supervisor appears friendlier to others.

Stell also testified that King instructed him to notify an older agent that the agent would be fired if he did not show positive growth within four weeks. Stell testified that, because of this particular agent's work situation, it would be impossible for the agent to show positive growth within that time frame. Stell also testified that once, when he did need to fire an agent, Liberty National's legal department asked him the gender, race, and age of the agent. When Stell replied that the agent was a white male under 40, he was told to proceed with the firing. Plaintiffs contend this evidence supports an inference that Liberty National was trying to "build a file" on protected employees before firing them. It may be true that this evidence indicates Liberty National was concerned about its liability under federal employment discrimination statutes. This evidence, however, does not suggest in any way that Liberty National was attempting to drive older employees out of the company by "building files" consisting of fabricated incidents. If

64

anything, it indicates Liberty National was conscientious about ensuring that protected employees were not fired without good cause.

Stell claims when he left the company, the specific incident on his mind was his telephone conversation with King in which King commented on Stell's weight. Stell testified he met with Tony McWhorter, Liberty National's president, and William Barcliff, Liberty National's chief legal counsel, to discuss King's harassment of Stell and to request a transfer out of King's division.[61]  He wanted to be transferred to Duce's division because he was "familiar" with Duce's management style.  McWhorter told Stell he could not transfer him.  Stell tendered his resignation.  McWhorter and Barcliff asked Stell to stay and asked what it would take to make him stay.  Stell said he would stay if they would transfer him out of King's division, but they still told him they could not make the transfer. Barcliff then asked if Stell planned to sue the company.  Stell was surprised by this question, as he did not intend to sue the company at that time.

---

[61]Stell admits not all of his contact with King was negative.  In fact, Stell testified that on May 31, 1993, King sent a letter to all District Managers praising Stell as a good example for them.  In February 1994, the company sent out another letter praising Stell's performance and sent Stell a congratulatory memo.

After Stell tendered his resignation, King met with Stell and apologized for everything unpleasant he had said or done, telling Stell that was just his management style. Stell complained that he had been forced to spend $5,000 out of his own pocket to, among other things, send the Sales Manager to Cancun, and King offered to write him a personal check to reimburse him for those expenses if Stell would stay with the company. Stell once again said he would stay if he could be transferred out of King's division, and King told him a transfer would be impossible.

Sexton called Stell at home on one occasion and visited him two weeks later, asking him to come back to the company. Stell, however, said he would not come back unless he could be transferred out of King's division. The company refused.[62] Later, Regional Vice President Newell Cheeseborough contacted Stell, and Stell gave him the same demand.

Stell testified he did not believe at the time he resigned that he had been discriminated against on the basis of his age. Accordingly, even though Stell claimed to have complained to the company about King's "harassing" and "threatening" behavior, he never told anyone the harassment and threats were age-

---

[62]As mentioned above, Stell's willingness to return to the company if he could be transferred out of King's division indicates he did not believe discrimination was Liberty National's "standard operating procedure."

related, because Stell did not think at the time that they were age-related. The

record reveals that Stell left his position because he did not like King's

management style. After Stell's resignation, he spoke with other people and came

to the conclusion that he "fit in the pattern of the older district managers being

replaced by younger district managers." He then determined King's treatment of

him was part of "a program designed by the management, upper management of

this company, to remove the older district managers."[63]

Stell's letter of resignation is quite revealing and is reproduced here in its

entirety:

Mr. McWhorter;

May 8, 1978 was one of the happiest days of my life. That was the day that I joined the sales force of Liberty National. I will never forget the words told to me by District Manager George Bates, "Take care of LNL and LNL will take care of you". These are words that I have tried to live with for the last 17 years, but I don't feel that I can anymore. Working for LNL is no longer fun for me but something I have grown to dread.

---

[63]Stell testified that Horton told him during his first week as District Manager in Troy, Alabama, that his predecessor "was forced to either retire or be replaced because he had gotten to old to be effective in his job." Stell admitted, however, that the Troy district had been performing very poorly before he arrived, suggesting his predecessor did not do a good job. Even if Stell believed his predecessor was forced into retirement, he did not believe at any time before he resigned that Liberty National was trying to force him to leave his job because of his age.

I have always been a person that motivated people to want to do their job, to try to help them reach their goals and dreams, not a person that had to threaten a person with their job if the results were not what I wanted.  I can not bring myself to operate this way or to treat people this way.

For several months, I have been considering opening my own agency.  I have always thought that I wanted to sell other insurance products that LNL didn't offer, such as medical insurance, disability, dental, etc..  For this reason I have been making contacts with several companies and general agents, but I have not made any attempts to sign contracts or get licensed with anyone.  My loyalty is still with LNL until my decision was made.

I have been made an offer to become a partner in Brokerage Concepts, Inc. with Olley Kelley, which I have decided to accept.  **I want you to know that I don't have any hard feelings toward you or LNL** and that I am not leaving with the idea of replacing LNL's business.   However, due to the fact that I will be working the same area, I will be calling on some of the same customers, but to add to their coverage not replace what they have.

**I have enjoyed my relationship with LNL and will always be greatfull [sic] to ya'll for giving me the opportunity that I have had.  I hope that if this doesn't work out for me that I might be allowed to return to LNL in the future.**

As I know how much change affects a District office, I feel that the quicker I am out of the picture the better it will be for my people to concentrate on the job they have to do.  Therefore, please accept this letter of resignation effective Friday, February 17, 1995.

**Again I have enjoyed my time at Liberty National and wish you the best.**

(emphasis added).

This letter certainly does not seem like the language of someone who feels

his working conditions are so intolerable he has no choice but to resign.  *Cf.*

*Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999)

68

("[P]laintiff's letter of resignation, in which she expressly thanks State Farm, does not by its terms lend support to a theory that plaintiff was forced to resign due to 'intolerable' working conditions."). Parts of the letter do suggest Stell was unhappy with the direction in which the company was moving. The letter reveals that perhaps he preferred a gentler style of management (i.e., motivating rather than "threatening"), but nowhere in the letter did he suggest that at the time he resigned, he felt he was treated unfairly because of his age. To the contrary, Stell represented that he would consider returning to Liberty National in the future.

Stell testified it was company policy to send PTMs to poorly performing employees. The PTMs routinely indicated that the employee in question would lose his or her job if performance did not improve. Stell further admitted that at least some of the PTMs sent to him expressed valid concerns about his performance. He therefore failed to prove that he was treated any differently than anyone else, or that Liberty National's treatment of him was in any way related to his age. Finally, and importantly, at the time he submitted his letter of resignation, Stell did not believe age discrimination was the reason for his treatment.

It is not our place to decide whether Liberty National's practice of sending "threatening" memos to its poorly performing employees was wise business policy, or whether Stell's preferred strategy of "motivating" the employees would have

worked better.  We must decide only whether the conduct as it related to Stell

violated the ADEA, and we conclude it did not.  The district court should have

granted Liberty National's motion for JMOL on Stell's claims because he failed to

prove he suffered an adverse employment action.  Accordingly, the verdict in his

favor must be reversed.

Plaintiff Stein

Plaintiff Stein resigned from his position as District Manager in Clearwater,

Florida, on July 29, 1994, at age 41.  Stein filed charges of discrimination with the

the FCHR and the EEOC in December 1994.[64]  When Stein resigned, he was

------

[64]Stein made the following allegations in his charge:

I was employed by Liberty National Insurance Company from November 5, 1975 until I was forced to resign on July 29, 1994.  As the result of management's desire to have younger management, I was subjected to continuous harassment and forced to resign when I was 41 years of age.  Andy King made my job as a district manager at Liberty National impossible once he became the vice-president in charge of my side of the company.  Under Andy King, I endured numerous changes in policies and procedures, as well as constant harassment and criticism, in his attempt to force my resignation.

One of my duties as a district manager included the screening of potential applicants for sales positions.  All of the district managers and myself were told not to send the file on any potential applicant to the home office for approval if that applicant was over the age of 60 or had health "problems".  Liberty National's actions constituted discrimination against applicants over 60 and applicants with health "problems" and created a hostile working environment.

Andy King and Don Horton verbally harassed me and continually made me feel like my job was in jeopardy in an effort to force me to resign.

I believe Liberty National, C.B. Hudson and Andy King have violated my rights, as well as the rights of both older workers and applicants, under the Age Discrimination in Employment Act and the Florida Civil Rights Act of 1992.  Liberty National, C.B. Hudson and Andy King have implemented a uniform practice and policy of age discrimination by forcing older employees to retire, take demotions, terminating them, and\or subjecting them to

71

replaced by Stan Watson, who was 14 years older than Stein.[65]

Stein testified that at a meeting of District Managers, King introduced the newer District Managers to "[a]ll you gray hairs." He heard King use the phrase "RC factor" to refer to an employee's "resistance to change." On several occasions, King said the company needed younger employees because older workers were resistant to change.[66]

---

continued harassment, abuse, and discriminatory policies and practices.

I file these charges on behalf of myself and all others similarly situated.

[65]The district court accepted Plaintiffs' argument that Watson may have been hired to help Liberty National develop a defense to a potential age discrimination suit by Stein. *Hipp*, 973 F. Supp. at 1041–42. Stein testified that Watson did not immediately get the position because King thought Watson was too old.

[66]Stein's attorney asked him on direct examination if he was "ever directed to fire somebody because of their age." Stein said he was. The questioning that followed concerned two older agents King instructed Stein to fire "because of their growth." Stein alleged King's growth numbers on the agents were incorrect, but nothing in his testimony established that King knew the numbers were incorrect or that the agents were being fired because of their ages.

Stein also complained about the company's alleged policy regarding hiring agents over age 55.[67] He said the company threatened to fire people who sent these files to the personnel department. He believed the policy was wrong, however, so he did not comply with it. He claimed Liberty National's Regional Vice Presidents refused to discuss the issue with him.

This policy, if it existed,[68] was certainly reprehensible. As discussed above, however, Stein was not subjected to this policy. The fact that Liberty National wrongfully discouraged Stein from hiring agents over age 55 does not establish that Liberty National forced Stein to resign from his District Manager position based on Stein's age, which was 41.[69]

---

[67]At trial, Stein testified that the policy applied to applicants over age 55. In his complaint to the FCHR, he stated the policy applied to applicants over age 60.

[68]On cross-examination, Stein was shown Liberty National's contracts with several agents who were over age 55 when Stein hired them. All of these agents were hired when this policy was allegedly in effect. Some of the agents also had known medical conditions when they were hired.

[69]Indeed, to hold otherwise would mean that any of Liberty National's employees who were over 40 at the time this alleged policy was in place could have simply resigned from their positions and sued Liberty National for age discrimination. ADEA was not meant to give one employee a cause of action for age discrimination against another.

Stein also complained that King "got very belligerent" over some of Stein's numbers, but the numbers on which King based his criticism were incorrect. Stein testified that King would not listen when Stein told him the numbers were wrong, and "it got to almost a violent situation."[70]

Stein also complained that a District Manager who looked younger than Stein was brought in to open up a new office in St. Petersburg, Florida.[71] Stein said King described this man as a "young and up-coming man, with lots of energy and [who is] going to show you how to do your job." This District Manager was given company money to fund his recruiting efforts, while Stein had to pay for his own recruiting. Since the other District Manager was starting a new office, and Stein was maintaining an existing office, we do not think this disparity is important, especially since Stein does not allege that other younger District Managers were likewise given recruiting budgets.[72]

---

[70]Stein claimed that, on the advice of Liberty National's legal counsel, he started an "Andy King file," but he left it in his desk when he departed. After the locks were changed, he could not retrieve the file.

[71]On cross-examination, Stein clarified that he did not know if the man actually was younger, but he looked younger. According to defense counsel, the man was actually one year older than Stein.

[72]Stein testified that, at the time, he had no problem with the new District Manager.

Stein testified that King's "constant harassment" of him made his job difficult. He claimed his responsibilities were "inconsistent," so he was constantly confused about what his job actually was.[73] One such "inconsistency" was that Liberty National required agents to begin selling on a bank-budget basis instead of a field-collection basis. Stein also testified that the company constantly changed the salary at which District Managers could hire new agents, and the company's goals on the number of new agents were also constantly changing. Stein also complained that when his three full-time secretaries left, he was not allowed to hire any new full-time secretaries, but some other District Managers were. Stein testified that his health was suffering as a result of his stressful work environment, and he "was not comfortable with . . . the way [he] was forced to treat [his] agents."

Stein signed a contract and took out a license with another life insurance company (C Corp) prior to leaving Liberty National.[74] He admitted this action was

---

[73]Stein admitted on cross-examination that King also sometimes sent letters to all District Managers praising Stein for something he had done particularly well.

[74]He signed this contract three months before he left, on April 6, 1994. He testified that he was told he had to sign the contract right away or the opportunity would no longer be there. He testified he signed it because he knew he was going to be leaving Liberty National in July. He had another job lined up,

in violation of his contract with Liberty National,[75] but claimed he did it because he could see he "had no future at Liberty National."[76] The offense was one that, according to Liberty National's employment manual, would "normally result in termination of employment."[77]

Stein does not allege that the younger District Managers were the ones who were allowed to hire full-time secretaries, and he does not allege that younger District Managers were treated any differently with respect to field-collection business and the hiring of new agents.[78] Stein testified that he did not know

and the other company wanted him to begin working, but he stayed at Liberty National, working under conditions he alleges were intolerable and getting worse. It seems unlikely that an employee who is constructively discharged under intolerable working conditions would plan his departure for three months.

[75]His actions in working for Liberty National likewise violated his contract with C Corp. C Corp eventually sued Stein to recover the money it had paid him as either salary or advance commissions. In that lawsuit, Stein asserted that C Corp could not recover the money from him because he performed work for it during the period in question. The suit was eventually dismissed.

[76]Plaintiff Hipp, who also worked for C Corp after he left Liberty National, testified that Stein spent about five hours a week working for C Corp while Stein was still employed by Liberty National.

[77]In fact, while he was at Liberty National, Stein himself fired other employees for the same offense.

[78]Stein did testify that the field-collection rules were different in other districts, but he did not

76

whether the rules on hiring new agents changed in other districts in the same way they changed in his. He also did not know whether the changes in the number of new agencies applied to other districts.

On direct examination, Stein testified that he believed age was a factor in the way he was being treated. He raised the issue in his letter of resignation, and no one attempted to persuade him to stay with the company. At deposition, however, Stein stated he could not recall anyone ever saying or doing anything that made him believe he was being discriminated against on the basis of his age. The record reveals that Stein resigned because he was unhappy with the direction in which the company was moving. There is no support for the conclusion that Stein was constructively discharged in violation of ADEA.

Based on this record, the finding that Stein was constructively discharged in violation of ADEA is not supported by the evidence. The district court should have granted JMOL to Liberty National on Stein's claims, as he failed to prove he suffered an adverse employment action. Accordingly, the verdict in Stein's favor must be reversed.

---

testify that these differences depended on the ages of the District Managers. Stein complained about the forms on which District Managers reported production, but he admitted they were the same in every district in King's region.

Summary

After our thorough review of the extensive record created in this case, we are left "with the definite and firm conviction that no reasonable [people] in [Plaintiffs'] position[s] would have felt compelled to resign." *Wardwell*, 786 F.2d at 1557. At most, Plaintiffs have proven that King had a harsh, confrontational, and perhaps even at times offensive style of management, and the company was changing some of its policies regarding the manner in which it conducted its business. While King's management style may or may not have been effective, and the changes in Liberty National's business practices may or may not have been wise, it is not our place to tell employers how to run their businesses. *See Chapman v. AI Transport*, 229 F.3d 1012, 1031 (11th Cir. 2000) (en banc). Plaintiffs have not proven that age-based harassment caused their working environments to become so objectively intolerable that they had no choice but to resign.[79] Since Plaintiffs have not shown that they were subjected to adverse employment actions, the district court should have granted judgment as a matter of

---

[79]As we have found Plaintiffs were not constructively discharged, we need not address Liberty National's claims regarding the amount of damages awarded.

law to Liberty National on Plaintiffs' claims,[80] and its judgment in favor of

Plaintiffs must be reversed.[81]

---

[80]Assuming hostile environment claims are cognizable under ADEA, the Plaintiffs also have not met the less stringent standard for a hostile environment. *See Massey Yardley*, 117 F.3d at 1249 n.7 (noting this circuit has not explicitly determined whether the hostile environment framework developed in Title VII cases applies to ADEA cases). In evaluating hostile environment claims, courts are to "determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 2283 (1998) (citation omitted). The conduct Plaintiffs allege was not sufficiently severe or pervasive as to constitute a hostile environment. "We recognize that claims of employment discrimination . . . present fact-intensive issues. However, we agree with the Fifth Circuit's observation that motions for summary judgment or judgment as a matter of law are appropriate to 'police the baseline for hostile environment claims.'" *Mendoza*, 195 F.3d at 1244 (quoting *Indest v. Freeman Decorating, Inc*., 164 F.3d 258, 264 n.8 (5th Cir. 1999)); *see also id.* at 1246-47 (listing cases in which courts have found no sex-based hostile environment).

[81]Liberty National argues Plaintiffs should not have prevailed because they did not prove they had reported offensive behavior pursuant to Liberty National's anti-harassment policy. *See, e.g., Coates v. Sundor Brands*, 164 F.3d 1361, 1364-65 (11th Cir. 1999) (hostile environment plaintiff must notify employer of harassment and give employer a chance to remedy the situation); *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("A constructive discharge will generally not be found if the employer

## III. CONCLUSION

We AFFIRM as to the district court's certification of the opt-in class. We REVERSE, however, the district court's definition of the temporal scope of that class. The rearward scope should have been limited to 180 days (in non-deferral states) or 300 days (in deferral states) before Plaintiff Stein filed the representative charge in this case. Plaintiff Lee's claim therefore fell outside the temporal scope

---

is not given sufficient time to remedy the situation."). Plaintiffs argue they were not required to complain because the alleged policy originated with the very people to whom complaints should have been directed. They also allege that, even though it was not required, they did complain. The record reflects at least some of the Plaintiffs complained to the legal department about King's behavior. The jury was instructed that Liberty National would not be liable if it proved "by a preponderance of the evidence that it maintained an antiharassment policy and complaint procedure and that the plaintiffs unreasonably failed to make a complaint under that procedure." The jury apparently found there was no such unreasonable failure. Most of Plaintiffs' complaints to the company seem to have centered on the over-55 hiring policy, which is not directly relevant to Plaintiffs' claims that they personally were harassed and forced out of the company. It is unclear whether any Plaintiff actually complained to the company about age-based harassment directed toward him**, but it seems unlikely, given that most Plaintiffs did not suspect age discrimination when they left Liberty National**. It is unnecessary for us to decide this question, however, since we determine Plaintiffs did not prove they were constructively discharged because they did not prove their working environments were objectively intolerable.

of the class, and he should not have been allowed to join. The jury's verdict for Plaintiff Lee is REVERSED. The forward scope of the class should have been cut off the day Plaintiff Stein filed the representative charge with the EEOC. Since the claims of Plaintiffs Agee, Tuggle, and Carter arose after that date, those Plaintiffs should not have been allowed to join in this action, and the jury verdicts in their favor are REVERSED. We also REVERSE the finding of a pattern and practice of discrimination in this case, because there was insufficient evidence that discrimination was Liberty National's standard operating procedure. Finally, we REVERSE the jury's verdicts as to Plaintiffs Hipp, Stein, and Stell, because those Plaintiffs did not prove they were subjected to age-based hostile environments or constructively discharged because of their ages.

AFFIRMED in part and REVERSED in part.