Felicia BURCH, et al., on behalf of themselves and other individuals similarly situated, Plaintiffs,

v.

QWEST COMMUNICATIONS INTERNATIONAL, INC., et al., Defendants.

Civil File No. 06–3523 (MJD/AJB).

United States District Court, D. Minnesota.

July 24, 2007.

James H. Kaster, Matthew C. Helland, Sarah M. Fleegel, and Sofia B. Andersson, Nichols Kaster & Anderson, PLLP, Minneapolis, MN, for Plaintiffs.

Daniel C. Barr and Mary Bridget McMullen, Perkins Coie Brown & Bain, Phoenix, AZ, and Melissa Raphan and Ryan E. Mick, Dorsey & Whitney LLP, Minneapolis, MN, for Defendants.

## MEMORANDUM OF LAW & ORDER

MICHAEL J. DAVIS, District Judge.

## I. INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Conditional Class Certification and Judicial Notice. [Docket No. 67] The Court heard oral argument on June 15, 2007.

## II. BACKGROUND

### A. Factual Background

#### 1. Parties and General Background

Defendants Qwest Communications International Inc., Qwest Communications Corporation, and Qwest Corporation (collectively "Qwest" or "Defendants") operate Consumer Call Centers and Small Business Call Centers in multiple states. The locations, number, and types of call centers have changed over the past few years, and between 2003 and the present, Qwest has operated Consumer Call Centers in thirteen states and Small Business Call Centers in six states.

Plaintiffs are current and former nonexempt employees in Qwest's Small Business and Consumer Call Centers throughout the country. Qwest agrees that Plaintiffs are entitled to overtime compensation

under the Fair Labor Standards Act ("FLSA"). As part of their job duties, Plaintiffs are required to answer inbound calls from Qwest customers or potential customers and deal with service and/or sales related issues from customers across Qwest's fourteen-state region.

Plaintiffs and opt-ins claim that they had to perform work without compensation before, after, and during their shifts. They had to log onto the computer system and open numerous software applications in order to be ready to accept a call from a Qwest customer waiting in queue and read daily company e-mails regarding policies, trainings, meetings, work schedules, and regulatory changes. However, each Qwest call center employee's phone serves as the employee's time clock and work time is tracked through the time that the employee logs into and out of his phone. Qwest does not track when an employee is logged onto his computer or e-mail. Thus, Plaintiffs allege that employees are not paid for work time if it occurs outside the time that they are logged into their telephones.

According to Qwest, each shift, called a "tour," for a Sales Consultant or Sales and Service Consultant lasts approximately 450 minutes plus two 15 minute rest breaks and a meal break lasting either a half-hour or one hour. (Some employees do work up to 600 minutes or work part-time.) According to Qwest, the first thing a call center employee does at the beginning of her tour is log onto her phone and the last thing she does at the end of her tour is log off her phone. While logged in, employees may put their phone on "not ready" status or request "closed time" to performed after call work and other off-line tasks without being interrupted by incoming calls.

2. Qwest Job Descriptions at Consumer Call Centers

Qwest has a high volume of consumer calls. Qwest schedules its consumer workforce and each Consultant receives a schedule specifying the start and end of her tour, as well as her break times and lunch time. Additionally, Consultants must be logged onto their phones and available to take calls, i.e. with the phone not on "not ready" status, for a certain average percentage of the tour. However, if an employee needs additional time to complete off-line tasks, he can request "closed time," which does not count against his availability.

In the Consumer Call Centers, Qwest employs Consumer Sales Consultants, Consumer Sales and Service Consultants, Wireless Sales and Service Consultants, We Can! Sales and Service Consultants, El Centro Sales Consultants, and Sales and Service Consultants in Qwest's Center for Customers with Disabilities. Each job type has a different availability requirement from a 90% availability requirement for Consumer Sales Consultants to an 80% availability requirement for Wireless Sales and Service Consultants. Some jobs only have availability requirements for part of the week. For example, Sales and Service Consultants in Qwest's Center for Customers with Disabilities are only scheduled to take calls for a small portion of their work week, and when they are scheduled to take calls, they are subject to the 88% availability requirement.

Additionally, the availability requirements for some jobs have changed over the years. For example, We Can! Sales and Service Consultants, who handle calls related to Qwest's special programs, such as customer and employee referral programs and affinity programs, are now subject to an 83% availability requirement, but before July 2005, they were not subject to any availability requirement. As another example, El Centro Sales Consultants, who handle incoming service and billing-related calls for Spanish speaking

customers were subject to an 88% availability requirement, but in 2007, Qwest began to allow El Centro Sales Consultants an additional 5 minutes on Monday and 15 minutes Tuesday through Friday at the beginning of their tours when they are not expected to be available for incoming calls so that they can log into their computers and attend team meetings.

### 3. Qwest Job Descriptions at Small Business Call Centers

Qwest's Small Business Call Centers handle incoming sales and service calls from existing and prospective small business customers. Each Small Business Call Center specializes in a particular area. For example, the St. Paul Small Business Call Center handles small business "loyalty" calls—calls from customers seeking to discontinue their service.

Small Business Call Centers have a lower call volume than Consumer Call Centers, and Small Business consultants usually have 2–5 minutes between incoming calls during which they could perform off-line tasks. However, the calls are usually more complicated than consumer calls and require more call work and other attention. Small Business consultants typically develop relationships with their customers and often correspond by e-mail with their customers and return customers' phone calls. To complete off-line work, Small Business consultants can request "closed time" or can refer off-line work to the Small Business Regional Support Center.

Small Business Sales Consultants have an 85% availability requirement, and Small Business Sales and Service Consultants, also called "Care Consultants," have an availability requirement of 65%.

### 4. Other Positions

Qwest also lists four other sales and service consultant positions. Subject Matter Expert Sales and Service Consultants,

usually perform off-line work supporting customer problems and generally only take incoming calls one day a week. Depending on their location, they may have availability requirements on that one day or have no availability requirement. Regional Support Sales and Service Consultants generally work off-line and make corrections to orders; they are not subject to availability requirements. Help Desk Sales and Service Consultants usually perform off-line work and are not subject to any availability requirements. Employees at the E–Commerce Center in St. Paul where the Sales and Service Consultants handle electronic communications with customers, are not on the telephone and have no availability requirements.

### 4. Qwest Written Overtime Policy

Qwest's official written policy, embodied in the Collective Bargaining Agreement between Qwest and the Communications Workers of America ("CBA"), defines the basic work week as 40 hours and provides that employees shall be paid one and one-half hours pay for each hour worked in excess of the scheduled shift for a particular day and for each hour worked in excess of 40 hours in a calendar week. The CBA also provides that "all actual work time" is included in the calculation.

### 6. Qwest Monitoring of Overtime

Qwest employs a variety of methods to monitor its employees. Defendants claim that they rely on local supervisors to enforce the FLSA. Defendants point to local supervisor training regarding the FLSA and off-the-clock work and note that, in weekly meetings and by e-mail, supervisors remind employees to report all hours. Defendants also note that, beginning in late 2006, some call centers have implemented a practice called "Start of Tour Huddles." During this time, Tuesday

through Friday, each consultant's tour begins with 15 minutes before he or she is scheduled to be available to take calls. On Monday, the tour begins five minutes before he or she is scheduled to be available. The consultant is paid for five minutes to boot up and log into the computer and ten minutes for meetings or "huddles."

Defendants also claim that supervisors regularly walk the call center floor to monitor whether consultants are working off the clock. They claim that, in certain locations, the supervisors' tours are coordinated with their employees' tours so that they can monitor to prevent overtime.

Defendants also point out that supervisors can view a consultant's schedule through a computer program called "Webstation," and local "Mission Control" can electronically monitor all consultants who are logged into their phones and see what the consultants are doing. A computer program alerts consultants if they are not adhering to their schedules. When consultants do not adhere to their schedules, Mission Control contacts the employee and supervisors. Qwest provides detailed examples of protocols at various Call Centers, but all are substantially similar. In addition to local Mission Control centers, Qwest employs two National Mission Control Centers that monitor employees' adherence to their schedules; one monitors all business call centers and the other monitors all consumer call centers.

Qwest has employed different methods for employees to track their own overtime, such as "exceptions logs," in which consultants record their schedules and the local Mission Control revises the schedules to reflect actual time worked. In other locations, consultants input overtime and other schedule deviations into a Webstation program.

### B. Procedural Background

On August 30, 2006, Plaintiffs filed a putative class action Complaint against all three Defendants alleging violations of the FLSA, violations of the Minnesota Fair Labor Standards Act ("MFLSA"), and unjust enrichment. The Complaint was filed on behalf of persons working at Qwest's St. Paul, Minnesota Call Center.

On April 10, 2007, Plaintiffs filed an Amended Complaint on behalf of all current and former Call Center Sales Consultants and/or Sales and Service Consultants working at Qwest's call centers nationwide. The Amended Complaint alleges Count I, Violations of the FLSA for failure to pay overtime; Count II, Violation of the MFLSA Minimum Wage and Overtime Requirements; Count III, Violation of the MFLSA Rest and Meal Break Requirements; Count IV, Violation of the MFLSA Record Keeping Requirement; Count V, Violation of the Colorado Minimum Wage Act ("CMWA") and Regulations Promulgated Thereunder; and Count VI, Violation of Oregon State Law and Regulations Promulgated Thereunder. The claims are all based on the allegation that Plaintiffs and similarly situated employees nationwide did not receive pay for the time that they spent performing necessary work tasks before and after their scheduled shifts. Plaintiffs also allege that they have been denied work and meal breaks and have not been compensated for working during meal breaks.

As of the date of this motion, over forty current or former employees, representing eight Qwest locations, for both Small Business and Consumer Call Centers, are Plaintiffs or have filed consent forms to joint this action.

A similar FLSA overtime lawsuit entitled *Brechler v. Qwest Communications, Int'l, Inc., et al.,* Case No. CV 06–0940–PHX–ROS, is venued in the District of

Arizona. The court in that case denied conditional certification of a nationwide FLSA action on the grounds that the plaintiffs had not offered competent affidavits from individuals outside of Arizona to support the allegation of nationwide FLSA violations. The Court did conditionally certify a class limited to Phoenix, Arizona employees.

Plaintiffs now move to conditionally certify the case before this Court as a national collective action; obtain Court authorization to send notice to similarly-situated employees within the three-year statute of limitations; and require Qwest to produce a list of all Sales and Service Consultants and Sales Consultants employed by Qwest at its Small Business and Consumer Call Centers nationwide within the three-year statute of limitations.

## III. DISCUSSION

### A. Plaintiff's Request to Supplement the Record

By letter dated June 18, 2007, Plaintiffs sought to expand the record considered by the Court regarding the current motion. Plaintiffs' counsel admitted that, during oral argument, he referenced and read from pages of a deposition transcript that were not part of the record. Plaintiffs' Reply for this motion was due by June 1, 2007. Counsel offers no explanation for the failure to submit this additional evidence until weeks after the Reply was due. The Court will not accept or consider this untimely evidence.

### B. Standard for Conditional Class Certification

Plaintiffs seek conditional class certification and Court-facilitated notice pursuant to the FLSA, 29 U.S.C. § 216(b). The statute provides:

An action ... may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Id.*

■ The Court performs a two-step process to determine whether a case should be certified under the FLSA:

First, the court determines whether the class should be conditionally certified for notification and discovery purposes. At this stage, the plaintiffs need only establish a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan. In the second stage, which occurs after discovery is completed, the court conducts an inquiry into several factors, including the extent and consequences of disparate factual and employment settings of the individual plaintiffs, the various defenses available to the defendant that appear to be individual to each plaintiff, and other fairness and procedural considerations.

*Dege v. Hutchinson Tech., Inc.*, Civil No. 06–3754 (DWF/RLE), 2007 WL 586787, at *1 (D.Minn. Feb.22, 2007) (unpublished) (citations omitted).

In the first step,

the Court only must determine whether Plaintiffs have come forward with evidence establishing a colorable basis that the putative class members are the victims of a single decision, policy, or plan. The court does not make any credibility determinations or findings of fact with respect to contrary evidence presented by the parties at this initial stage.

*Id.* at *2 (citations omitted).

■ This case is at the first step.

### C. Whether Plaintiffs Are Similarly Situated

#### 1. Plaintiffs' Relevant Similarities

Plaintiffs assert that they are similarly situated, as demonstrated by the fact that the declarations from nineteen individuals representing current and former Qwest employees from both Small Business and Consumer Call Centers in five different states have made almost identical allegations. All nineteen declared that they performed similar job duties under similar working conditions and were not paid for time spent performing necessary work tasks off-the-clock. Each described the time it takes to log onto the computer and open software applications before logging onto the phone. They also describe being required to read e-mails, which could only occur outside of regular work hours. Plaintiffs also argue that the fact that individuals from several different Qwest call centers have opted into this litigation in the absence of judicial notice demonstrates that a class of similarly situated and interested individuals exists.

Although Qwest points to many small differences in the job descriptions of different employees, it does not dispute the relevant facts: Qwest's phone log-in system serves as the time clock for Plaintiffs and putative class members; Plaintiffs and putative class members all have to log onto the computer, boot up several computer programs, and perform other duties before accepting calls; Qwest uses the same scheduling system at all call centers nationwide; and Qwest uses the same "Mission Control" monitoring procedures at all call centers. Although the availability requirements vary for different job titles, at this stage of the litigation, the relevant similarities make conditional certification appropriate. Furthermore, at this stage, Plaintiffs are not required to provide evidence showing Qwest's illegal practice at every location or that Plaintiffs are identi-cally situated to putative class members in all respects. *See, e.g., Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1217 (11th Cir.2001) (holding that, under § 216(b), "[p]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members") (citation omitted).

The Court now turns to specific arguments that Defendants have asserted against conditional certification.

#### 2. Conditional Certification of Off–the–Clock Classes

Defendants admit that, while cases involving whether the plaintiffs are misclassified as exempt from the FLSA overtime requirements may be appropriate for certification, off-the-clock cases are often inappropriate for certification. *See, e.g., West v. Border Foods, Inc.,* Civil No. 05–2525 (DWF/RLE), 2006 WL 1892527, at *9 (D.Minn. July 10, 2006) (unpublished) (holding class was inappropriate for conditional certification because "Plaintiffs were employed at different store locations, where different individual restaurant managers allegedly used varying means to deprive the Plaintiffs of proper compensation for his or her overtime hours[;] ... the nature of the asserted violation differ among the Plaintiffs; the number of uncompensated overtime hours that are being claimed range from two (2) to twelve hours (12) hours weekly, and, ... the alleged violations are contrary to the Defendants' official written policy, which precludes store managers from requiring employees to work off-the-clock, and requires payment of time and one-half for all overtime hours worked") (citation omitted). Defendants also argue that when there are many difference among the plaintiffs such as location, job duties, supervisors, and salaries, conditional certification is inappropriate. *See Ray v. Mo-*

tel 6 Operating, Ltd. P'ship, No. 3–95–828, 1996 WL 938231, at *4 (D.Minn. Mar.18, 1996) (unpublished) (refusing to certify class when overtime decisions were made by local supervisors in twenty different states).

The cited cases are distinguishable. In West, there was no allegation of a centralized monitoring system similar to the national Mission Control. Nor was there an allegation of an identical task that all potential class members had to perform before "punching in" for work, like the requirement in this case that all employees had to boot up their computers before logging into their telephones. In Ray, the court was not addressing the lenient first stage of certification; rather, the court based its decision on the "extensive" facts before it. Id. Moreover, unlike in this case, there was no evidence of centralized monitoring.

Finally, the Court notes that other courts have conditionally certified similar off-the-clock cases, leaving the individual issues of job duties until the second stage of certification analysis. See, e.g., Sherrill v. Sutherland Global Servs., Inc., 487 F.Supp.2d 344, 349–50 (W.D.N.Y.2007) (conditionally certifying off-the-clock FLSA class of telemarketers from various states who were allegedly required to arrive early to sign into the computer and review e-mails before their official work time started because affidavits described uniform policies at ten of eleven call centers and a company-wide time system).

### 3. Qwest's Written Policy

Defendants assert that certification is inappropriate because Qwest's nationwide policy is to pay overtime. They note that Qwest's official written policy defines the basic work week as 40 hours and provides that employees shall be paid one and one-half hours pay for each hour worked in excess of the scheduled shift for a particu-

lar day and for each hour worked in excess of 40 hours in a calendar week. Plaintiffs respond that Qwest is too sophisticated to memorialize its intention to violate the FLSA in a formal written policy, but that the opt-in declarations from various call centers demonstrate that Qwest has a national practice of violating the FLSA.

The existence of a written policy dictating overtime pay is one factor weighing against conditional certification. West, 2006 WL 1892527, at *9. However, at this early stage of litigation, the mere fact that Qwest has a written policy does not defeat Plaintiffs' motion in light of Plaintiffs' countervailing evidence of a centralized policy to not pay overtime.

### 4. Number of Plaintiff Affidavits

Defendants also claim that Plaintiffs have not identified a widespread, common policy in violation of the FLSA. They assert that declarations from 19 individual employees out of a pool of approximately 8,000 individuals, or less than 1%, do not establish a common scheme. Cf. West, 2006 WL 1892527, at *6 (holding that affidavits from 2.5% of the potential class did not "support the Plaintiffs' assertion of widespread violations resulting from a common policy or plan" where allegation was that individual managers required employees to work off-the-clock). Also, Defendants note, Plaintiffs have only offered declarations from a minority of Qwest's call center locations in existence during the relevant time period. See Baum v. Shoney's Inc., No. 98–423–CV–ORL–19B, 1998 WL 968390 (M.D.Fla. Dec.3, 1998) (unpublished) (refusing to conditionally certify class of workers as 175 franchised restaurants in 11 states when plaintiffs had only provided affidavits from employees in restaurants in one county in Florida because plaintiffs failed to show that potential class

members were "victims of a single decision, policy, or plan").

This case is a distinguishable from *West* and *Baum*. Here, although the percentage of potential class members submitting affidavits is smaller than in *West*, Plaintiffs have submitted evidence of a common scheme in which all workers are monitored by a nationwide monitoring system rather than only by individual managers. Also, although Plaintiffs have not submitted affidavits covering every call center that employed potential class members, the record contains a variety of affidavits from many different call centers, evidence of a common nationwide monitoring system, and evidence that job duties do not significantly vary from call center to call center.

### 5. Qwest's Dependence on Local Supervisors

Defendants assert that, in order to adhere to the FLSA, Qwest relies on local supervisors at each call center, so there cannot be evidence of a widespread plan. They note that, in the similar Arizona case, the court denied a motion for nationwide conditional certification, reasoning that any FLSA violation "is a local problem which would be the fault of the particular supervisor." (*Brechler* Order, Mar. 31, 2006, at 7.) However, in *Brechler*, the plaintiffs had provided no competent affidavits from employees outside of Phoenix, Arizona; in this case, Plaintiffs have provided affidavits from a variety of call centers in various states indicating a widespread plan to deny overtime compensation.

Defendants argue that, in this case, supervisors enforce overtime rules through e-mails, meetings, walking the call center floors, and monitoring consultants' schedules through computers. They also note that local Mission Control monitors employees' phones and computer schedules. Finally, Defendants note the different methods they employ for tracking employ-

ee time. They conclude that the variety of monitoring methods mean that there cannot be a single, nationwide plan to force employees to work off of the clock.

While the distinctions noted by Defendants may be relevant at the second stage of certification, at this point, Plaintiffs have garnered sufficient evidence of centralized enforcement. The differences in the methods of monitoring and tracking overtime are minor, and all employees are monitored by the same telephone time system that raises the same issues regarding pre-telephone computer boot-up time. Also, Defendants admit that, in addition to local Mission Control centers, there are also two National Mission Control Centers that monitor employees' adherence. This centralized monitoring weighs in favor of a nationwide class certification.

### 6. Differing Allegations of Uncompensated Time

Defendants also argue that Plaintiffs and opt-in Plaintiffs are not similarly situated because their affidavits allege widely varying amounts of time worked off the clock, from 15–20 minutes per week to 10–20 hours per week. However, most affidavits allege between 2 and 4 hours of off-the-clock work per week. The Amended Complaint alleges that Plaintiffs and similarly situated individuals work, on average, 30 minutes per day off-the-clock per person, which is consistent with the majority of the affidavits. The variation in off-the-clock time is "more appropriately addressed after the completion of discovery and during the second stage of the certification determination." *Scott v. Heartland Home Fin., Inc.*, Civil Action No. 1:05–CV–2812–TWT, 2006 WL 1209813, at *3 (N.D.Ga. May 3, 2006) (unpublished) (citations omitted).

### 7. Plaintiffs' Responses to Defendants' Requests for Admissions

Defendants also note that in response to their Requests for Admissions, which related only to the St. Paul Small Business Call Center, Plaintiffs stated that they did not have the information necessary to admit or deny admissions about their own schedules such as the length of a typical tour, the number and length of rest and meal breaks, and availability requirements. Defendants argue that if Plaintiffs cannot even confirm the similarity of their own schedules and jobs within the St. Paul Small Business Call Center, then they cannot assert that Qwest employees nationwide are similarly situated.

Plaintiffs respond that the Request for Admissions defined "Plaintiffs" to include "each and every individual who becomes a member of the class, either by filing a consent to joint this action or by class certification." Thus, at this early stage of the litigation, before Qwest has even provided contact information for the putative class, Plaintiffs could not make binding factual admissions on behalf of thousands of individuals who may later join the case.

The Court agrees that, in light of Plaintiffs' explanation, their response to the Request for Admissions does not defeat their argument that they are similarly situated under the lenient conditional certification standard.

### 8. Availability of Individualized Defenses

Defendants argue that certification is inappropriate because different defenses will apply to different Plaintiffs. They note that some Plaintiffs have been absent from work for FMLA or other reasons and, thus, could not have been forced to work overtime during those times. Also, employees are required to report overtime, so Defendants argue that they will have to analyze whether each employee did docu-

ment her overtime, whether failure to report absolves Qwest of liability, and whether each employee's supervisor was aware of the overtime work. These concerns are more appropriately addressed at the second stage of the certification process.

### 9. Conclusion

The Court grants Plaintiffs' motion for conditional certification. The certification standard at this initial stage is low. Plaintiffs have submitted nineteen affidavits from Qwest locations in five different states alleging the same off-the-clock practices. Qwest admits using a nationwide centralized monitoring system. Although it uses various methods of recording overtime, it also admits using the same system to record all employees hours: the telephone. All employees use the same telephone system. There is no allegation that it takes fifteen minutes for employees in the five states to start up their computers and software but somehow takes less time in other states. Plaintiffs have established a colorable basis that they are victims of a single, nationwide policy by Qwest to illegally withhold overtime pay. At this initial stage, conditional certification of a nationwide class is appropriate.

### D. Judicial Notice

"[D]istrict courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) ... by facilitating notice to potential plaintiffs." *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 169, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). "Because trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement early, at the point of the initial notice, rather than at some later time." Id. at 171, 110 S.Ct. 482. "By

monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative. Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed. This procedure may avoid the need to cancel consents obtained in an improper manner." *Id.* at 172, 110 S.Ct. 482. "Court authorization of notice serves the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." *Id.*

The Court exercises its discretion to facilitate notice in this case. Court-facilitated notice will assist in preventing the expiration of claims based on the running of the statute of limitations. Also, due to the large size and geographic scope of this putative class, it would be difficult for Plaintiffs to rely on word of mouth or Plaintiffs' counsel's independent efforts to provide a fair method of providing timely, adequate notice of the lawsuit.

Defendants ask that, if the Court does certify the proposed Class, it adopt their proposed changes to Plaintiffs' proposed notice, which make some small modifications and instruct that the Clerk of Court should not be contacted regarding the notice. More significantly, the changes inform potential Plaintiffs that the statute of limitations may be two or three years and limit the consent form to FLSA claims, deleting references to state law claims.

In their Reply, Plaintiffs agreed to all of Qwest's proposed changes. At oral argument, Plaintiffs raised an objection to Qwest's deletion of the language on the Consent Form stating, "If this case does not proceed collectively, I also consent to join any subsequent action to assert claims against Qwest ... where I did not receive compensation for all my time worked." Plaintiffs now argue that this deleted language is necessary in case the Court splits this case into multiple cases so that Plain-

tiffs will not be required to affirmatively opt into a second case. However, the Court concludes that the deleted language is not necessary and is confusing. Moreover, none of the examples of Judicial Notice in previous FLSA cases in this District offered by Plaintiffs contain such language.

The Court approves the notice as altered by Qwest. Notice will be provided to all potential class members within the potential three-year limitations period. At this early stage in the litigation, the Court cannot tell if the alleged violation was willful or not. Exclusion of potential plaintiffs based on application of the two-year statute of limitations would be premature at this juncture.

E. Production of List of Employees

Plaintiffs request that the Court enter an Order requiring Qwest to produce, within ten days from the date of the Order, an electronic list of all persons employed by Quest at Small Business and Consumer Call Center locations as Sales and Service Consultants or Sales Consultants from August 30, 2003, to the present, with their first and last names, last known addresses, dates of employment, location of employment, last four digits of their social security number, and date of birth. Qwest has not objected to this request, so the Court grants Plaintiffs' request.

Accordingly, based upon the files, records, and proceedings herein, IT IS HEREBY ORDERED:

1. Plaintiffs' Motion for Conditional Class Certification and Judicial Notice [Docket No. 67] is GRANTED as follows:

   a. Defendants are ordered to provide Plaintiffs' counsel with a list of all individuals employed at Qwest Small Business and Consumer Call Centers nationwide as Sales Consultants and/or Sales and Service Con-

sultants since August 30, 2003; this list shall include name, address, telephone number, dates of employment, location of employment, last four digits of their social security number and date of birth and shall be in electronic and importable format; Defendants are ordered to provide this list within ten days of the date of this Order.

b. Plaintiffs' proposed Judicial Notice, as modified by Defendants (Ex. E to Barr Decl.) is hereby APPROVED, and Plaintiffs' counsel shall be authorized to mail such notice to the putative class members identified in the list provided by Defendants.

2. Plaintiffs' request to supplement the record, contained in Plaintiffs' letter dated June 18, 2007 [Docket No. 90] is DENIED.